# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

INDEPENDENT CAB ASSOCIATION, INCORPORATED v. PEGGY C. LA-
TOUCHE AND JOHN MURCHISON, JR.

October 10, 1955.

Record No. 4418.

Present, All the Justices.

The opinion states the case.

*Sands, Marks, Sands, Hening & Sydnor,* for the plaintiff in error.

*William C. Parkinson, Leith S. Bremner* and *Robert Clinton Moss,* for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

Peggy C. LaTouche, hereinafter called the plaintiff, was injured when a taxicab in which she was riding as a paying passenger, and operated by Independent Cab Association, Inc., collided on the Lee Bridge in the city of Richmond, with a car driven by John Murchison, Jr. Upon her motion for judgment against the Cab Association and Murchison, there was a trial before a jury which resulted in a verdict for the plaintiff against the Cab Association in the sum of $15,000, and in favor of the codefendant, Murchison. The Cab Association's motion to set aside the verdict was overruled and judgment was entered thereon. Before the judgment became final the Cab Association filed a motion to vacate the judgment, set aside the verdict of the jury, and award it a new trial on the ground of after-discovered evidence. This motion was overruled and the matter is now before us on a writ of error awarded the Cab Association which contends that, (1) The verdict against it is contrary to the law and the evidence and without evidence to support it; (2) The court erred in its rulings on certain instructions granted and refused; and (3) The court erred in refusing to award

this defendant a new trial on the basis of after-discovered evidence.

First, as to the sufficiency of the evidence:

Lee Bridge is a concrete structure running approximately north and south, spanning the James River and connecting what is referred to in the record as South Richmond with the city proper. It is 3,700 feet long, with a 40-foot roadway designed for vehicular traffic, and sidewalks on both sides. The center of the roadway across the bridge is marked by the usual unbroken double white lines. On either side of the center lines are the conventional broken white lines indicating two northbound lanes and two southbound lanes, each approximately ten feet wide. The record does not indicate the height of the bridge but it shows that there are no intersections on either side of the main structure. The maximum speed limit on the bridge is fixed at 35 miles per hour.

According to the evidence introduced on behalf of the plaintiff, on May 16, 1953, about 9:00 p. m., the taxicab was proceeding northwardly along the bridge in the right-hand northbound lane, at a speed of approximately 35 miles per hour, following a large trailer-truck. When the taxicab was about the middle of the bridge its driver turned his vehicle to the left, increased his speed to from 40 to 45 miles per hour, and without sounding his horn attempted to overtake and pass the trailer-truck on its left side. In undertaking this maneuver the left wheels of the taxicab went across the double white lines marking the center of the roadway and into the southbound passing lane and collided with the Murchison car which was being driven southwardly in the southbound passing lane. The left front of the taxicab collided with the left front of the Murchison car and the force of the impact knocked the latter car around so that its rear end went across the double white lines. The Murchison car came to rest, headed southwest, across the center lines with its rear in the northbound passing lane and its front in the southbound passing lane. After the impact the taxicab came to rest, headed northwest, with its left front wheel over the double white lines and its radiator approximately across the center lines.

This account of how the collision occurred was related by the plaintiff, by Murchison, and by a passenger in the latter's vehicle. Both Murchison and Miss LaTouche testified that at the time the taxicab undertook to pass the trailer-truck the latter vehicle was partly in the northbound passing lane, with the result that there was insufficient space for the taxicab to pass it on the left without crossing the center lines of the roadway,

Worsham, the driver of the taxicab, died shortly after the collision from causes unconnected therewith and was not available as a witness.

Robert E. Hunter, a service man, was called as a witness for the Cab Association. He testified that he was walking northwardly across the bridge on the sidewalk adjacent to the northbound lane. The northbound taxicab overtook and passed him and as it reached the approximate center of the bridge and was proceeding in the northbound passing lane it collided with the southbound Murchison car which, he said, came across the center lines and into the lane in which the taxicab was proceeding. Just before the impact the hood of the Murchison car flew up. He was positive that just before the collision the taxicab was not in the act of overtaking and passing a trailer-truck, or any other vehicle. According to this witness the force of the impact knocked the front of the taxicab across the double center lines of the roadway and into the southbound passing lane. The rear of the Murchison car came to rest in the northbound passing lane.

A police officer, George S. Perkins, who made an investigation of the accident before the vehicles were moved, testified that he found the taxicab headed in a northwesterly direction with its left front wheel beyond the double center lines and in the southbound passing lane, its radiator on the center lines, and its rear in the northbound passing lane. He found the Murchison car headed southwesterly, partly across the doublt center lines, with about half of its body in the northbound passing lane. He saw debris from the impact partly on the double white lines and partly to the east thereof. He observed in the northbound passing lane and on or near the double center lines what he described as "push marks," indicating that the taxicab had been driven back by the force of the impact.

Andrew S. Chancellor, an investigator for the Cab Association, reached the scene within eight or ten minutes after the collision. He found the taxicab headed in a northwesterly direction with its left front on the center lines and its rear in the northbound passing lane. The Murchison car was headed in a southwesterly direction with its right front on the center lines and its rear in the northbound passing lane. This witness found debris in the northbound passing lane. In the same lane he found "push marks" which indicated, he said, that the taxicab had been pushed over by the impact.

Chancellor further testified that Murchison told him that just before the impact the hood to his car flew up which caused him to lose control of his vehicle. Murchison testified that the impact had caused the hood to fly up.

It was the function of the jury to weigh this conflicting evidence, to determine the proximate cause of the collision, and to say whether the driver of the taxicab failed to exercise the high degree of care which the law imposed upon him for the safety of his paying passenger.

■ The Cab Association complains of the action of the trial court in granting over its objection Instruction No. 2 which read thus:

"The court instructs the jury that the driver of an overtaking motor vehicle, when traveling outside of a business or residence district, shall give audible warning with his horn or other warning device before passing or attempting to pass a vehicle proceeding in the same direction. And the court tells you that if you believe from the evidence that the driver of the cab of the defendant, Independent Cab Ass'n., Inc., at or about the time of the accident in question, attempted to overtake and pass a motor vehicle proceeding in the same direction, outside of a business or residence district, without giving audible warning with his horn or other warning device, the defendant, Independent Cab Ass'n., Inc., was guilty of negligence."

This instruction was predicated upon Code, § 46-225, which reads:

"*Horn signal upon overtaking vehicle.*—The driver of an overtaking motor vehicle when traveling outside of a business or residence district shall give audible warning with his horn or other warning device before passing or attempting to pass a vehicle proceeding in the same direction."

"Business" and "residence" districts" are thus defined in our traffic laws:

Code, § 46-185. " '*Business district*' defined.—The territory contiguous to a highway where seventy-five per centum or more of the total frontage, on both sides of the highway, for a distance of three hundred feet or more is occupied by buildings actually in use and operation for business purposes shall constitute a business district for purposes of this title."

Code, § 46-186. " '*Residence district*' defined.—The territory con-

tiguous to a highway not comprising a business district where seventy-five per centum or more of the total frontage, on both sides of the highway, is mainly occupied by dwellings or by dwellings and buildings in use for business purposes shall constitute a residence district for purposes of this title."

It will be observed that in each statute the factor which determines the nature of the district is the "occupied" "frontage on both sides of the highway." If "seventy-five per centum or more of the total frontage, on both sides of the highway, * * * is occupied by buildings actually in use and operation for business purposes," it is a business district. If, on the other hand, "seventy-five per centum or more of the total frontage, on both sides of the highway, is mainly occupied by dwellings or by dwellings and buildings in use for business purposes," it is a residence district. Hence, the phrase "territory contiguous to a highway" means the territory lying along and adjoining the highway. *Mitchell* v. *Melts*, 220 N. C. 793, 18 S. E. (2d) 406, 410.

The instruction complained of does not define "a business or residence district," as it should have done, but there was no objection in the lower court on this ground and it will not be considered for the first time on this appeal. Rule 1:8.

█ It is argued before us that there was an insufficiency of evidence upon which the jury could determine whether or not the area "contiguous" to the highway extending across the bridge was "outside of a business or residence district." But no such point was raised in the court below and it will not be considered by us. Rule 1:8. Indeed, counsel for the defendant took the position in the trial court, in objecting to the instruction, that "the factual picture from the standpoint, from the type of district in this case, is clear. The court should take judicial notice of the fact that Lee Bridge goes across several business establishments, on a higher level." Hence, it was argued in the lower court that the court should hold as a matter of law that the bridge was in a business district and refuse the instruction.

Evidently counsel on both sides assumed that the nature of the structure and its surroundings were so well known to both the court and the jury that the production of evidence of these factors was unnecessary. As has been said, there is evidence that the structure is 3,700 feet long and carries a 40-foot roadway, flanked on each side by a sidewalk. It is a matter of common knowledge that the bridge crosses the river at a height of nearly one hundred feet, and

that no buildings of any character front on or lie along the 3,700 feet of the highway which traverses the bridge. Hence, it is clear that just prior to the collision the taxicab was "traveling outside of a business or residence district" within the meaning of Code, § 46-225.

█ We do not agree with the argument that there is no evidence of causal connection between the failure of the driver of the taxicab to sound his horn and the collision. As has been said, both Murchison and the plaintiff testified that when the taxicab undertook to pass the trailer-truck the latter vehicle was partly in the northbound passing lane and that consequently there was insufficient space for the taxicab to pass without crossing the center lines of the roadway. From this evidence the jury had the right to infer that had the taxicab driver sounded his horn the driver of the trailer-truck would have pulled to the right, cleared the passing lane, and given the taxicab sufficient space to pass without encroaching upon the lane in which the southbound Murchison car was traveling. In short, the question of causal connection was for the jury.

On the record before us we find no reversible error in the granting of this instruction.

Complaint is next made of the refusal of the trial court to grant Instruction "G" which in substance told the jury that if the cab driver saw the Murchison car heading across the double white lines he had the right to assume that it would return to its proper side of the highway before reaching the taxicab.

In our opinion this instruction was properly refused. The driver of the taxicab did not testify. Consequently, there is no evidence that he saw the movements of the Murchison car prior to the collision, or acted upon the assumption that it would return to its proper side of the highway.

█ The final assignment of error is that the lower court erred in not granting the defendant's motion for a new trial on the ground of after-discovered evidence. The circumstances pertinent to this assignment are these:

On direct examination the plaintiff testified that as the result of the collision she sustained sprains to her knees and ankles and very severe injuries to her back. This latter injury, she said, had been quite painful, necessitating expensive medical treatments over a long period of time, required her to wear a brace even at the time of the trial, interfered very seriously with her work as an undergraduate nurse, and impaired her income from that source. On direct exam-

ination she was asked by her counsel, "Had you had any trouble with your back prior to this accident?" to which she replied, "No, sir."

Dr. James T. Tucker, who treated the plaintiff from the date of her injury down to the time of the trial, testified that upon examination shortly after the accident he found her suffering from bruises on both knees, both ankles, her arms, and a lumbo-sacral strain. There were no fractures and all but the back injury had cleared up by September 1, 1953. The back injury, the physician said, was still giving the plaintiff pain and discomfort at the time of the trial. He agreed that the back injury interfered with her duties as a nurse and would express no opinion as to when this condition would clear up. He further testified that she gave him no history of any prior back injury.

It appears from the affidavit of counsel for the defendant, filed with the motion for a new trial, that on the day of the trial, at the luncheon recess, he received a telephone call from an unknown person who refused to divulge his name but inquired whether he was trying "the LaTouche case." Upon receiving an affirmative answer it was suggested to counsel that he "ask her about an accident in September, 1951, for which she went to the hospital." The informant refused to give counsel any further particulars.

Upon the resumption of the trial after the luncheon recess, counsel for the defendant recalled the plaintiff to the stand and this examination followed:

"Q. Miss LaTouche, is it or is it not a fact that you were injured in an automobile accident, prior to this time you were in the cab, something along about September of 1951?

"A. No, I was in an accident on the 4th of July, just a slight—up here on my head (indicating), I got a couple of scratches.

"Q. What year was that?

"A. It was on the 4th of July, about four years ago.

"Q. Were you hospitalized for that injury?

"A. No, I wasn't."

Two days after the trial had been concluded counsel was again called on the telephone by the same person, who again refused to divulge his name, and asked whether he had questioned the plaintiff "about an accident in which she was injured in September, 1951." Upon being informed that the plaintiff had denied at the trial that she had sustained such an injury, the informant remarked, "She is a

damn liar." After further questioning informant advised counsel to get in touch "with a man named Bryant in Alexandria, Virginia," who would be able to give him full particulars concerning an accident "on Labor Day, 1951," in which the plaintiff had suffered a "back injury for which Bryant had made a settlement with her."

After a short investigation Auta Ray Bryant, who had formerly lived at Alexandria, was located and his affidavit obtained. This affidavit stated that on Labor Day, September 3, 1951, on U. S. Route No. 1, in Henrico county, Virginia, a car which Bryant was driving was in a collision with another car driven by Lawrence Coleman, and that there was a passenger in the Coleman car, "Mrs. Peggy LaTouche, who claimed to have injured her back in the accident." About a week later Bryant received a letter from Thomas A. Williams, a member of the Richmond bar, demanding damages for "a serious and permanent back injury" which "Mrs. LaTouche" had sustained in the collision. Having no insurance on his car, Bryant entered into an agreement with Miss LaTouche, through her counsel, as the result of which he paid her the sum of $800 in full settlement of her claim and received a release therefor. Bryant's affidavit was accompanied by the correspondence which passed between him, Miss LaTouche and her counsel, as well as a copy of the release which she signed.

There was an affidavit from John H. Thomas to the effect that on the night of September 3, 1951, Labor Day, he was a member of the state police force and was called to the scene of an accident on U. S. Route No. 1, in Henrico county, involving vehicles operated by Coleman and Bryant. His notes of the investigation showed that among the several injured passengers in the two vehicles who were sent to the Medical College Hospital at Richmond, was "Mrs. Peggy LaTouche" who had been a passenger in the Coleman vehicle and who complained "of a severe back injury," "possible broken back."

According to the affidavit of Plummer B. Clark, an official of the Cab Association, a careful investigation was made of the circumstances of the collision on Lee Bridge, in which the plaintiff was injured, and such investigation did not produce any information which tended to show that she had ever been injured in a prior automobile accident, or that she had sustained prior injuries to her back.

In resisting the motion for a new trial, the plaintiff filed counter

affidavits of herself and others. In her affidavit she admitted that she was riding as a passenger in the Coleman car on the night of September 3, 1951, when the vehicle was in collision with the Bryant car on U. S. Highway No. 1. The affidavit further disclosed that she "was shaken up and hurt about her head and neck" and was taken to the emergency room of the Medical College Hospital where she was treated and released the same night. She further stated that "her back was not injured" in that accident and that she had not told Bryant that it had been.

In his affidavit Coleman stated that Miss LaTouche had made no complaint to him nor had he heard her say that her back was injured in that accident.

There were affidavits from members of the plaintiff's family that she made no complaint that she had sustained any injury to her back in the September 3, 1951, accident.

According to the affidavit of counsel for the defendant, the existence of the evidence pertinent to the plaintiff's former injuries could not have been discovered prior to the trial by the use of due and reasonable diligence. This affidavit further states that such evidence is material to the issues involved in the action, can be produced at a new trial, and would probably produce a different result.

The general principles involving the granting of a motion for a new trial on the ground of after-discovered evidence are well settled in this jurisdiction. They are thus summarized in Burks Pleading and Practice, 4th Ed., § 324, pp. 601, 602, 603:

" * * * Applications for new trials are addressed to the sound discretion of the court, and are based on the ground that there has not been a fair trial on the merits.

"A new trial for after-discovered evidence is granted with great reluctance and with special care and caution. In order to justify a new trial for after-discovered evidence, (a) the evidence must have been discovered since the trial, (b) it must be material in its object and such as on another trial ought to produce opposite results on the merits, (c) it must not be merely cumulative, corroborative, or collaterial, and (d) it must be evidence that could not have been discovered before the trial by the use of due diligence, and such as can be produced at another trial. This is undoubtedly the general rule, but exceptional cases may arise when the courts will find it necessary to depart from it. * * * So where the after-discovered testimony, if true, shows that the party's own evidence, or that of his principal

witness, upon a material point, is fabricated, perjured or mistaken, or is in corroboration of the unsupported testimony of the accused in a criminal case, a new trial should be granted. At least, if the party has used due diligence to secure the evidence. The real object to be attained in granting a new trial is to prevent an erroneous judgment from becoming final. 'Where in the light of after-discovered evidence, grave doubt is entertained as to the correctness of the verdict, and it seems probable that if the newly-discovered evidence had been before the jury a different verdict would have been reached on the merits, the verdict should be set aside.' In determining this, counter affidavits filed by the party in whose favor the verdict was found should be considered. * * *"

Thus, while the party moving for a new trial on this ground is held to exacting requirements, the rule is somewhat relaxed in its application where the after-discovered evidence, as in the present case, strongly tends to show that the plaintiff's own testimony upon material points in the case was untrue. *Harris* v. *Wall*, 144 Va. 774, 779, 130 S. E. 899; *Land* v. *Yellow Cab Co.*, 150 Va. 467, 472, 143 S. E. 709; *Cremeans* v. *Myers*, 136 W. Va. 157, 67 S. E. (2d) 28, 31; *Rexrode* v. *Monongahela, etc., Service Co.*, 122 W. Va. 361, 10 S. E. (2d) 584, 586; 66 C. J. S., New Trial, § 110, p. 315.

In *Land* v. *Yellow Cab Co., supra,* a motion for a new trial was granted upon evidence which tended to show that the plaintiff had testified falsely as to the nature and extent of her injuries. The new trial resulted in a verdict in favor of the plaintiff for a considerably smaller amount. On appeal, in which the plaintiff asked that the first verdict be reinstated, we approved the action of the lower court in granting a new trial and affirmed the judgment based on the verdict at the second trial.

In each of the cases, *Cremeans* v. *Myers, supra,* and *Rexrode* v. *Monongahela, etc., Service Co., supra,* the judgment was reversed for the failure of the lower court to grant a new trial based on after-discovered evidence tending to show that the plaintiff had given false testimony with respect to the nature and extent of his injuries.

Where no counter affidavits have been filed the facts contained in the affidavits in support of the motion for a new trial are accepted as true. *Stubbs* v. *Cowden*, 179 Va. 190, 198, 18 S. E. (2d) 275, 279. On the other hand, where counter affidavits are filed, the statements therein must be considered along with those in the affidavits filed in support of the motion. Thus, from a consideration

of the affidavits and counter affidavits it is the duty of the trial court to determine whether or not the new evidence if offered would probably result in a different verdict. *Zimmerman* v. *Commonwealth*, 167 Va. 578, 586, 587, 189 S. E. 144, 148.

Measured by these principles we are of opinion that the motion for a new trial should have been granted. The plaintiff's own counter affidavit shows that she testified falsely when she denied that she had been injured in the September, 1951, accident. The after-discovered evidence shows not only that she was injured in that accident, but that her injuries were of the same nature as those of which she now principally complains. Thus it goes beyond discrediting her testimony. It tends to throw additional light on the source and extent of her injuries and may materially affect the measure of her damages.

It is true that the counter affidavits of the plaintiff and others show or tend to show that she did not sustain a back injury on that occasion. But the plaintiff does not deny that she made demand upon Bryant for such an injury. Nor is there any affidavit by her attorney, Williams, denying that he made such a demand on her behalf. It is significant, too, that there is no affidavit from the physician who treated her for the September, 1951, injuries, or from any attendant at the hospital to which she was taken, showing the nature and extent of such injuries.

In the light of the after-discovered evidence it is for the jury to say whether the back injury, of which the plaintiff now principally complains, was attributable to the accident which is the basis of the present suit or was attributable in whole or in part to the former accident. If such additional evidence had been presented at the former trial, and the jury had believed that the plaintiff's back injury was attributable wholly or in part to the former accident, it is reasonable to assume that the damages, if any, allowed her would have been materially reduced. If upon a new trial the jury reaches a like conclusion a different result from that of the former trial should follow.

We do not agree with the argument on behalf of the plaintiff that by the exercise of due diligence on the part of the Cab Association or its counsel the after-discovered evidence could have been discovered before the former trial. A careful investigation prior to the trial revealed nothing which put the officials of the Cab Association or its counsel upon notice of the plaintiff's prior injuries.

As has been said, the first intimation of this reached the defendant's counsel during the progress of the trial. He then recalled the plaintiff for further cross-examination and asked her whether she had been previously injured in an accident "about September of 1951." Her answer was, "No." Counsel for the defendant had the right to accept this answer as true, especially in view of the fact that she had testified that she had had no previous injury to her back, and her physician testified that she had given him no history of any such injury.

The plaintiff was a vital witness on the issue of the negligence of the cab driver and whether such negligence was a proximate cause of the collision. She testified positively that the cab driver attempted to pass the trailer-truck at a speed of from 40 to 45 miles per hour. This is the only direct evidence that in so doing he was exceeding the speed limit. Moreover, she testified positively, as did Murchison, that the cab driver did not sound his horn before attempting to pass the trailer-truck. She also testified, as did Murchison, that there was not sufficient space for the taxicab to pass the trailer-truck without crossing the center lines. Because the plaintiff's testimony is thus vital on the issue of the negligence of the cab driver, we are of opinion that it should be considered by the jury in the light of the admission in her counter affidavit.

Accordingly the judgment is reversed, the verdict set aside, and the case remanded for a new trial on all issues.

*Reversed and remanded.*