# Richmond

VIRGINIA LINEN SERVICE, INCORPORATED v. SARA ESTOLENE ALLEN.

January 21, 1957.

Record No. 4607.

Present, Hudgins, C. J., and Eggleston, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*John G. May, Jr.* and *Ernest G. Garrett, Jr.,* for the plaintiff in error.

*George E. Allen, Sr.* and *Wilbur C. Allen (John T. Manning* and *Allen, Allen, Allen & Allen,* on brief), for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

■ On the morning of November 18, 1954, the plaintiff below, Mrs. Sara Estolene Allen, was a passenger in a Chevrolet automobile operated by her husband in a northerly direction on the Petersburg Turnpike, in Richmond, which is a part of U. S. Route 1 and is a six-lane highway between Petersburg and Richmond. A school bus had stopped in the right-hand lane near the curbing to pick up school children. Its red blinker lights signaling traffic to stop were operating. A Ford ranch wagon, driven by William D. Evans, stopped in the center lane of the three northbound lanes to the left of the school bus. The Chevrolet in which plaintiff was riding was following the ranch wagon and stopped immediately behind it. Shortly thereafter a truck belonging to Virginia Linen Service, Incorporated, defendant below, now the appellant, and driven by its agent, ran into the rear of the Chevrolet with what is described in the evidence as a terrific impact, knocking the Chevrolet forward against the ranch wagon. Extensive damage was done to the front and rear of the Chevrolet and to the left full front of the truck. The plaintiff received personal injuries for which she brought this action in January, 1955. The case was tried on May 31 and June 1, 1955, before a jury which returned a verdict for the plaintiff for $25,000, on which the court entered the judgment appealed from.

The defendant concedes that the verdict and judgment have concluded the question of liability against it. There is no specific assignment of error as to the amount of the verdict but the defendant seeks a reversal of the judgment on the grounds now to be discussed.

First: A week before the trial the defendant moved the court to select and appoint a disinterested expert in neurology, or otherwise, to examine the plaintiff to ascertain the nature and extent of her injuries and give such other testimony as the court might require. The court, after considering the argument of counsel, denied that mo-

tion and then the defendant, without waving its exception, moved the court to require the plaintiff to submit to an examination by one or more physicians selected by the defendant and appointed by the court. The court granted the latter motion and ordered that the plaintiff report to Dr. Claude L. Neale at a designated time and place for examination. The defendant argues that this procedure violated our Rule 3:23 (d).[1]

In *Basham* v. *Lowe*, 176 Va. 485, 11 S. E. 2d 638, decided before the adoption of this Rule, it was pointed out that the authorities were in conflict on the power of a court to require a plaintiff to submit to a physical examination. See Annotations, 51 A.L.R. 183; 108 A.L.R. 142. That case approved the majority holding that a trial court had that power and it was said in the opinion:

"While in some cases plaintiffs have been required to submit to examinations by physicians selected by the defendant, the better rule is that unless consent is given by the plaintiff, the court should, upon application of the defendant and after reasonable notice to the plaintiff, name some disinterested physician or physicians to make the examination. * *."

The *Basham* case was from the Industrial Commission. Section 64 of the Workmen's Compensation Act, now § 65-87 of the 1950 Code, authorized the Commission to appoint "a disinterested and duly qualified physician or surgeon" to make any necessary examination of the *employee* and to testify in respect thereto, the fees and expenses to be paid by the State. The Commission required the claimant who was not the employee to submit to an examination by physicians selected by the insurance carrier. We held that the statutory rule could be applied to a claimant who was not an employee, but that if an examination was necessary it should have been made by a physician selected by the Commission, and who was in that sense "disinterested" or impartial. It was said that "a physician selected, employed and

---

[1] Rule 3:23. Depositions Under Code Sections 8-304 and 8-305 and Discovery.

* * *

(d) If the pleadings raise an issue as to the mental or physical condition of a party the court, on motion of an adverse party, may order the party to submit to an examination by one or more physicians named in the order and employed by the moving party. A written report of the examination shall be made by the physicians to the court and filed with the clerk before the trial and a copy furnished to each party. The court may in the order fix the time and place for the examination and the time for filing the report and furnishing the copies. The written report shall not be admitted in evidence unless offered by the party who submitted to the examination,

paid by either the plaintiff or the defendant is not 'disinterested' or impartial within the meaning here intended."

Rule 3:23 (d) is broader than the rule adopted in the *Basham* case under the statute. The purpose of Rule 3:23 (d) was to secure or preserve to a defendant the right, in a proper case, to have the injured person examined. The Rule says the court "may order" the examination. Whether it will do so is in the sound judicial discretion of the court on the showing made. The Rule provides that the examination shall be made by the physician or physicians named in the order. It does not say how the court shall determine who shall be named. If the court wishes it may require counsel to make suggestions or furnish a list of qualified persons. The court may investigate their fitness and their availability, then make its selection and name its choice in its order. The Rule says the person named in the order shall be employed by the moving party. That means he is to be paid by the moving party and it is the business of the court to arrange about that.

It is not the purpose of the Rule to create a final arbiter of medical disputes nor to provide a new way of settling conflicts between medical witnesses. That must remain the function of the jury, or of the court if there is no jury. The person appointed to make the examination is necessarily the selection of the court but that is not to invest him with the quality of inerrancy. He may be called as a witness by either party and examined and cross-examined as any other witness. If his report is put in evidence by the party examined, the other party may then cross-examine him.

It appears in this case that the plaintiff agreed to be examined by any physician or physicians selected by the defendant. It was not error of which the defendant can complain that the court named the physician whom the defendant suggested.

■ Second: The defendant moved to strike out the plaintiff's evidence as to brain injury on the ground that it was not sufficient to make that a jury question.

The force of the collision was described by those who saw it. The defendant's driver said it was "a pretty good blow"; the driver of the school bus said it sounded like an explosion; the driver of the ranch wagon described it as "a terrific impact"; plaintiff's husband said it was a loud, terrific blow.

The impact jerked the plaintiff backward, then she was thrown forward, hitting the dashboard and then falling to the floor. When

it was over she appeared odd, as if she did not know what had happened. She held her hand to the back of her neck and complained of pain there. She was slightly hysterical on the way to the hospital. She was taken to the emergency room of the hospital where X-rays were made of her head and neck region. Later that day she was examined by Dr. R. D. Butterworth, an orthopedic surgeon, who testified she had no visible head injury but had a sprain of the upper dorsal cervical spine, with probably a mild concussion, and a contusion of her knee. She did not improve with treatment so he had her admitted to a hospital and traction was applied to her neck for six days. He examined her again the day before the trial and found only a mild tenderness at the base of the neck which he thought would clear up in the next few months.

While in the hospital and after leaving it the plaintiff suffered from headaches and the pain in her neck continued. A few weeks later she had a fainting spell and these have since increased in frequency. To the date of the trial, so her husband testified, she had had fifteen or sixteen of these spells, four during the month of the trial and three in the bank where she was employed. In February, 1955, she consulted Dr. Arthur Gathright, who sent her to Dr. John M. Meredith, a specialist in neurological surgery, who examined her and testified as a witness for the defendant, as referred to below.

Plaintiff's husband testified that when his wife received no relief he called Dr. Dumville at the suggestion of a friend. This was Dr. David Milton Dumville, who was called as a witness for plaintiff and testified at length as to her condition. He stated he was a specialist in internal medicine, with an office in Richmond, and gave his training and experience. He saw the plaintiff on April 23, 1955, and his testimony was that after that time he examined her twenty to twenty-five times and spent forty to fifty hours in making physical, neurological, fluroscopic, electroencephalographic and laboratory tests and examinations. He stated his findings to be that the plaintiff had suffered a "whiplash" injury of the neck, more commonly called a neck sprain, of a moderate degree, with a concussion of the brain and organic brain damage of a diffuse nature. He described how such injury may occur in an automobile accident and gave his opinion as to what plaintiff's future experience would be. Soon after he first saw the plaintiff, Dr. Dumville referred her to Dr. Shield at the suggestion of one of her attorneys.

This was Dr. James Asa Shield, of Richmond, also a witness for the

plaintiff. He described himself as a neuro-psychiatrist, specializing in diseases of the nervous system, explaining that neurology has to do with the structure or organic side of the nervous system and psychiatry with diseases of the mind. He gave his training and experience, and stated that he was on the consulting staff of practically all the hospitals in the city. He first saw the plaintiff on April 27, 1955. He described his examinations and tests and on the basis of these and of her history he expressed the opinion that she had sustained a brain injury and that her fainting spells, which she had not experienced before the accident, were due to the injuries she received in the accident.

There was other evidence that the plaintiff had never had fainting spells before the accident; that she had apparently been in good health prior to the accident, but afterwards in poor health; and as one witness expressed it, seemed to have lost her enjoyment of life.

The report of Dr. Neale, who was appointed by the court on the motion of the defendant, was offered by the plaintiff and admitted in evidence. He reported that he examined the plaintiff on May 26, 1955. He described the examinations made by him and stated "The type of fainting spells and headaches, plus electroencephalographic evidence of disturbance of brain waves, indicate organic brain damage."

Dr. Meredith, referred to above, testifying as a witness for the defendant, stated his training and that he was likewise on the staff of all the hospitals in the city, as well as on the faculty of the Medical College of Virginia; that his examination was of the condition of the plaintiff's neurological system and he did not find any definite abnormality. He concluded that the plaintiff's attacks "were in all likelihood not true convulsions, but fainting attacks not due to any of the usual causes," and he could not see any definite connection between the attacks and the accident. He did not make an electroencephalograph study.

The nature and extent of plaintiff's injuries were clearly questions for the jury and the court did not err in refusing to exclude from it the plaintiff's evidence relating to brain injury. *Neal v. Spencer,* 181 Va. 668, 673, 26 S. E. 2d 70, 72; *Johnson v. Capitol Hotel,* 189 Va. 585, 590, 54 S. E. 2d 106, 109.

Third: Defendant next alleges that the court erred in overruling its motion to set aside the verdict on the ground of after-discovered evidence. In support of the motion defendant filed the af-

fidavits of John G. May, Jr., and Ernest G. Garrett, Jr., its attorneys, and of G. Kenneth Miller, a member of their firm, together with affidavits of Robert G. Butcher and Richard L. Williams, attorneys, of Richmond. The plaintiff filed counter-affidavits by three members of the firm of Allen, Allen, Allen and Allen, who represented her.

The affidavits for the defendant related to five damage suits for personal injuries brought by the Allen firm in 1955, four before and one after the present case was tried, in which Dr. Dumville and Dr. Shield examined the plaintiffs and either testified or were prepared to testify as plaintiffs' witnesses. The general tenor of the affidavits is that in each case the defendant and a police officer had reported minor injuries, but the reports of Dr. Dumville and Dr. Shield set forth much more serious injuries, usually including damage to the brain. It was argued that this established a relationship existing between these lawyers and these doctors for the purpose of magnifying the plaintiffs' injuries in order to get more damages for the personal profit of the lawyers and the doctors; and that it was important to prove this relationship so the jury might "pass on the interest, bias or prejudice of the witnesses."

The affidavit of Mr. May shows that in the two cases referred to by him, neither of which had been tried at the date of the affidavit, the Allen firm had supplied him with copies of the reports of Doctors Dumville and Shield, as well as the reports of two other doctors, as to the plaintiffs' injuries, together with an itemized statement of the damages claimed, including the fees of the doctors who made the examinations and the reports. The Butcher affidavit stated that Dumville and Shield were "among the plaintiffs' doctors" in his case, and he filed a later affidavit stating that he was also furnished a copy of a report in that case made by Dr. James T. Tucker. The Williams affidavit related to two cases which were settled without trial and states that he also was furnished copies of the reports of Dumville and Shield and a statement itemizing the damages claimed, including the doctors' fees. Mr. Williams made a later affidavit stating that both of his cases were settled for fair values on the information furnished by the Allen firm and that he did not intend to reflect on the Allens or the doctors. The affidavit of Mr. Miller related to a case in which he represented the defendant in 1952 and incorporated a letter from Dr. Beath to George E. Allen, Jr., giving the latter detailed suggestions to help him "understand the medical problem and how to develop the medical evidence."

The counter-affidavits stated that in the cases referred to in the Williams and Butcher affidavits plaintiffs' counsel had furnished defendants' counsel with complete brochures of the cases, giving in detail the results of their investigations, and that before the trial in the present case defendant's counsel asked to see plaintiff's medical reports and were furnished the reports of Dr. Shield and Dr. Butterworth, and one of defendant's counsel was then told that Dr. Dumville had also examined the plaintiff, among others who were referred to in the report of Dr. Shield. The affidavit by the senior member of the Allen firm described their method of preparing for trial and their practice in the selection of doctors to examine the plaintiffs. They say in their brief that it is part of their responsibility as attorneys to secure the medical facts and that their practice is not different from that followed by defendant's counsel in selecting specialists to make examinations on behalf of their clients.

It would serve the interests of the medical profession and aid in maintaining its high standards if doctors who testify would heed the admonition recently given by a member of their profession,[2] that they avoid allowing themselves to be labeled a plaintiff's doctor or a defendant's doctor, and to "remember at all times that he is a witness and not an advocate."

We are presently concerned, however, with the sufficiency of the evidence offered in support of the motion to set aside the verdict in this case, and we measure it by rules that are well established. These include the rules that the evidence relied on could not have been obtained by exercising reasonable diligence before the trial and that it must go to the merits of the case and not merely to impeaching the character of a former witness. *St. John's Executors v. Alderson*, 32 Gratt. (73 Va.) 140, 143; *Moore v. Commonwealth*, 186 Va. 453, 464, 42 S. E. 2d 871, 876. The proffered evidence does not come within the principle stated in *Independent Cab Association v. La-Touche*, 197 Va. 367, 89 S. E. 2d 320.

Evidence of the relationship alleged in the affidavits could have been admitted only to impeach the character and discredit the testimony of Dr. Dumville and Dr. Shield. Moreover, counsel for defendant were advised before trial that Dr. Dumville and Dr. Shield had made examinations and reports in this case, and much of what is now relied on to establish the alleged relationship was then in existence and

---

[2] Dr. William Minor Deyerle in VIRGINIA MEDICAL MONTHLY, Vol. 83 (Sept., 1956), pp. 369-70.

could have been ascertained and made the subject of cross-examination. There was no error in refusing to set aside the verdict on this ground.

The remaining assignments are without merit and warrant little discussion. They are: (1) Refusal to compel the production of a letter from Dr. Meredith to George E. Allen, Jr., reporting that his neurological examination of the plaintiff was "entirely negative." Defendant's counsel had been told prior to the trial that Dr. Meredith had examined the plaintiff and reported this result. On cross-examination of plaintiff's husband, defendant's counsel asked him to inquire from plaintiff's counsel whether he had a report from Dr. Meredith and if so to give it to defendant's counsel. Dr. Meredith had already fully testified as a witness for the defendant and no reason appears for requiring this witness to secure the letter nor any use to which it could have been put if he had. (2) The court should not have permitted counsel to show that the plaintiff came from a hospital to testify. We do not find from the record that counsel did so. The plaintiff and Dr. Dumville testified that she was then in a hospital but no objection was made to that testimony. (3) Allowing plaintiff to introduce an aerial photograph of the scene of the accident. No good reason is advanced for excluding it and we can think of none. (4) In the opening argument to the jury one of plaintiff's counsel referred to plaintiff's loss of earnings and expenses and said, "Now can she afford this or is she to become a ward of the State, of the taxpayers?" Defendant's counsel moved for a mistrial, which the court overruled but instructed the jury that they must not consider the financial condition of the parties and to disregard "the few remarks that counsel made in that regard." In view of the instruction and from the record as a whole it appears that there was no prejudicial error in this incident.

The judgment below is

*Affirmed.*