UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, McCullough and Senior Judge Clements
Argued at Alexandria, Virginia

TERRYE L. RICHTER AND
  RUDY RICHTER

                                                  MEMORANDUM OPINION[*] BY
v.       Record No. 1166-12-4                     JUDGE RANDOLPH A. BEALES
                                                  MAY 7, 2013
DIANA NICHOLE MANNING, N/K/A
  DIANA NICHOLE PERRY

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Craig D. Johnston, Judge

William L. Schmidt (Brook T. Rolka; William L. Schmidt &
Associates, P.C., on brief), for appellants.

No brief or argument for appellee.

Terrye Richter and Rudy Richter (collectively, appellants) filed a petition for court-ordered

visitation with their paternal grandson, P.B., after Diana Nicole Perry (mother) forbade any further

contact between appellants and P.B.[1]  On appeal from the circuit court's denial of appellants'

visitation petition, appellants raise two assignments of error on appeal alleging that the circuit court

erred by (1) finding that P.B. would not suffer actual harm if his paternal grandparents were denied

visitation, and by (2) denying appellants' pre-trial discovery request for a Rule 4:10 psychological

examination of P.B.  For the following reasons, we affirm the circuit court's judgment in this case.

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] We refer to the minor child only by his initials in an attempt to better protect his
privacy.

## I. BACKGROUND

Applying settled principles of appellate review, we view the evidence in the light most favorable to mother (since she was the prevailing party in this circuit court), while also "granting [her] the benefit of any reasonable inferences." Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 834 (2003). The record on appeal here establishes that P.B. was born to mother and to Kyle Burlison (father) on June 25, 2007. Mother and father, who never married, had joint custody of the child. Father died in an automobile accident on July 1, 2009, when P.B. was barely two years old. Although mother and P.B. lived in appellants' home from June 12, 2010 until January 27, 2011, mother decided that P.B. would have no further contact with appellants (i.e., P.B.'s paternal grandparents) very shortly after they moved out of appellants' home. It is undisputed from the record on appeal that mother is a capable and fit parent.

On March 15, 2011, Mrs. Richter filed a petition for court-ordered visitation of P.B. in the juvenile and domestic relations district court (JDR court). In her petition, Mrs. Richter asserted that mother's decision to forbid contact between P.B. and Mrs. Richter was "inimical to [P.B.'s] welfare" and would cause "actual harm" to P.B. In support of this assertion, Mrs. Richter argued that mother had severed not only the bond between P.B. and his paternal grandmother – but had also severed P.B.'s closest link to his deceased father.[2] Mr. Richter, who is actually P.B.'s paternal step-grandfather, subsequently joined the litigation as a co-petitioner without objection from mother. The JDR court denied relief to appellants on September 16, 2011, and appellants appealed to the circuit court for a trial *de novo*.

_____

[2] Mrs. Richter sought, *inter alia*, the following relief in her petition in the JDR court: (1) visitation with P.B. "every other weekend from Friday at 4:00 PM until Monday at 10:00 AM"; (2) authority to travel with P.B. "to Arkansas at least one time per year to visit with paternal family members"; (3) "visitation with P.B. "July 13 and July 14 of every year and alternate all holidays of each year"; and (4) visitation with P.B. "during the summer for at least four (4) weeks." According to the record on appeal, July 14 was father's birthday.

<u>Appellants' Rule 4:10 Motion for a Psychological Examination of P.B.</u>

On May 26, 2012, the circuit court held a pre-trial hearing on appellants' motion pursuant to Rule 4:10 to have P.B. examined by Dr. Robert Marvin, a licensed clinical psychologist with an expertise in the field of attachment theory. Appellants' counsel proffered an explanation of how Dr. Marvin would conduct the psychological examination of P.B.[3] and also proffered that P.B. had a very close relationship with appellants before mother forbade any further contact between P.B. and appellants.

During the hearing, the circuit court expressed concern over whether the psychological examination would be in the young child's best interests, noting that P.B. would be subjected to "psychological poking and prodding" during the examination conducted by Dr. Marvin. The circuit court asked appellants' counsel whether there were any alternatives to a Rule 4:10 examination. Appellants' counsel replied that Dr. Marvin could be admitted as an expert witness in attachment theory and "testify in general about attachment and the things that the court should be looking for in that regard," although appellants' counsel maintained that Dr. Marvin could not fully testify about P.B.'s circumstances specifically if he did not conduct the requested Rule 4:10 examination. Appellants' counsel indicated that, "without the ability to have this examination conducted, *there is no way to be able to prove any actual harm* to [P.B.] as a result of the non-contact." (Emphasis added).

---

[3] Appellants' counsel proffered that Dr. Marvin, using "a one-way window," would observe P.B. and Mrs. Richter interact for about twenty to thirty minutes, then would observe P.B. and a complete stranger interact for about ten minutes, and then would observe P.B. and Mrs. Richter interact again. The same process would be repeated with Mr. Richter. Dr. Marvin would then engage in "interactive play" with P.B. using toys – while also "lay[ing] out the basic theme" of a story "about family and different things that happen with respect to families" and letting P.B. "tell [Dr. Marvin] what happens next" in the story. Dr. Marvin would then review the videotape of all of these interactions and "determine what if any harm may have come to [P.B.] as a result of, or what potential harm there is as a result of not having the relationship with [appellants]."

In a bench ruling, the circuit court denied appellants' motion for a Rule 4:10 psychological examination of P.B. The circuit court noted the proffer from appellants' counsel that P.B. had not seen appellants in over a year. The circuit court then found that the Rule 4:10 motion was essentially a request "that we let this Dr. Marvin experiment on this child and figure out whether he's got an attachment to his grandparents" – and also noted that P.B. was only four years old at the time of the hearing. The circuit court then explained:

> *I agree with the mother's counsel that's an undertaking that's fraught with peril for the boy.* If we let him see his grandparents for the first time in a year, and then have a hearing to decide whether he's never going to see them again, and the very -- putting him through that experience where he gets to see his grandparents for twenty minutes and then he doesn't get to see them again until we have a trial and then he may never get to see [them] again, *that in itself is introducing something that I don't think is appropriate in this child's life.* And while [appellants' counsel] may say it would be difficult for him to present evidence in other ways as to whether some attachment has occurred, [Dr. Marvin is] certainly capable of testifying with respect to attachments that are fixed by what age and what factors the court should look for in determining whether that attachment still exists.
>
> *There's got to be some other way to develop that evidence to assist the Court in determining attachment and its [e]ffects without subjecting this boy to an experiment.*

(Emphasis added). Furthermore, while the circuit court at the pre-trial hearing denied appellants' motion for a Rule 4:10 examination, it did permit appellants to issue a subpoena *duces tecum* requesting records from P.B.'s pediatrician and preschool.

<u>Trial Evidence and Findings of the Circuit Court</u>

During a two-day trial, appellants and mother presented evidence concerning P.B.'s relationship with his paternal grandparents and the circumstances under which mother forbade contact between appellants and the child. It was undisputed that appellants had significant contact with P.B. both before and after father's death. When father enrolled at the University of Tennessee, appellants frequently drove P.B. to visit father there. While mother and P.B. continued to live with

mother's parents for about eleven months following father's death, appellants maintained frequent contact with P.B. With mother's permission, Mrs. Richter even took P.B. alone on an extended trip to visit out-of-state relatives.

Mother and P.B. began residing at appellants' residence on June 12, 2010. At trial, mother acknowledged that appellants had a loving relationship with P.B. Mother also acknowledged that appellants (particularly Mrs. Richter) "did a good amount" of P.B.'s caretaking when mother and P.B. lived at appellants' home – especially when mother was at work or attending classes – but mother did not concede that Mrs. Richter was ever his primary caretaker. Mother and P.B. moved out of appellants' home on the night of January 27, 2011. Mother testified that she decided to leave appellants' home after ending a romantic relationship with one of Mrs. Richter's relatives, who was also residing at appellants' home at the time. Mother testified that continuing a relationship with this person was not in P.B.'s best interests.

According to the record on appeal, appellants saw P.B. only once more after he and mother moved out of appellants' home – during a relatively brief visit at a local McDonald's restaurant on January 30, 2011. At trial, mother denied Mrs. Richter's allegation that mother had instructed P.B. not to speak with appellants at the McDonald's.

On February 2, 2011, Mrs. Richter and mother apparently had a dispute concerning (1) some items belonging to father that had great sentimental value to Mrs. Richter and (2) a key to appellants' home. Although the details of the dispute were heavily disputed at trial, the circuit court accepted mother's version of events. According to mother's testimony, as she was leaving appellants' home with some belongings, Mrs. Richter became confrontational and proceeded to follow mother in her car. Mother testified that, as Mrs. Richter followed her, Mrs. Richter allegedly tried to run her "off the road," prompting mother to call the police. Mother further testified that she sent Mrs. Richter an email within a week of the February 2, 2011 incident telling

Mrs. Richter that appellants were not to see P.B. any longer. The circuit court specifically found that mother's reason for denying appellants any further access to P.B. "really related to what happened . . . on February 2nd."

Mother testified that P.B. mentioned appellants only once thereafter. Mother testified that, about a month after mother and P.B. moved out of appellants' home, P.B. noted that a toy airplane on display at a Target store looked like one that he kept at appellants' home. Mother testified that P.B. did not ask to go back to appellants' house (but instead only wanted that toy), that he did not ask to speak to appellants on the telephone, and that she did not believe that moving out of appellants' home had a significant effect on P.B.

At the time of trial, P.B. was attending preschool. Mother testified, without dispute, that she frequently visits P.B. at preschool, that she observes him interacting normally with the children there, that P.B. is not defiant to authority, and that she has no reason to believe – from her conversations with P.B.'s preschool teachers – that he has difficulty forming friendships. Mother described P.B. as well-behaved, testified that he shows normal emotions, and said that he is regarded by others as "a very lovely and friendly child." Mother testified that P.B. asks about father sometimes (usually if P.B. sees something orange, which reminds him of the University of Tennessee, where father went to college) and that P.B. has pictures of his father in his room. Mother testified that she wants P.B. to feel free to ask questions about father's life. Mother testified that she would readily take P.B. to a child counselor if she believed that he needed counseling.

In addition, Dr. Marvin testified during appellants' case-in-chief as an expert "in the field of psychology and particularly as it relates to families and the field of attachment." Based on his expertise, Dr. Marvin testified that children form attachments to people who are important to them very early in their lives. He explained that children can be at risk for behavioral problems

caused by the severing of relationships to those persons to whom they are attached. Dr. Marvin described some of those harmful effects as being withdrawn, being oppositional, doing badly in school, and not interacting appropriately with peers. Dr. Marvin testified that he reviewed some materials provided by appellants. He concluded that P.B. was primarily attached to mother and that P.B. was secondarily attached to father, prior to father's death. However, Dr. Marvin also testified that P.B. appeared to be very attached to his paternal grandparents, especially Mrs. Richter.

During its bench ruling at the conclusion of the trial, the circuit court accepted Dr. Marvin's testimony that the severing of an attachment could potentially result in harm to a child. However, the circuit court found that P.B. had not shown any actual or foreseeable signs of harm – such as being withdrawn, being oppositional, doing badly in school, and not getting along with his peers. In addition, the circuit court found that mother was "[b]eing alert to [P.B.] missing his father, putting his picture in his room, helping him deal with it, helping him adjust as he gets older to the lack of his father, keeping his father in his life while helping him deal with the loss." Furthermore, while the circuit court expressed empathy toward Mrs. Richter for the tragedy she has experienced by her son's death at such a young age, the circuit court also found that Mrs. Richter "will have difficulty helping P.B." process the loss of his father at this time. Finally, noting Dr. Marvin's testimony that "forced visitation where there are hard feelings is not good for a child," the circuit court concluded that court-ordered visitation was not appropriate in this case.

## II. ANALYSIS

### A. THE ACTUAL HARM STANDARD UNDER WILLIAMS

Throughout the course of this very sad and unfortunate case – in which mother has forbidden contact between her young child and his deceased father's side of the family – appellants

have acknowledged that the decisions of the Supreme Court of Virginia and of the Supreme Court of the United States guide the analysis here and set a very high burden for prevailing on their petition for court-ordered visitation with P.B. Those decisions hold that "[t]he relationship between a parent and child is a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment." L.F. v. Breit, 285 Va. 163, 182, 736 S.E.2d 711, 721 (2013) (citing Troxel v. Granville, 530 U.S. 57, 65 (2000)); see also Williams v. Williams, 256 Va. 19, 21-22, 501 S.E.2d 417, 418 (1998). Thus, as appellants' counsel recognized at oral argument before this Court, there is a "fundamental right of parents to make decisions concerning the care, custody, and control of their children." Troxel, 530 U.S. at 66.

Review of the circuit court's denial of appellants' petition for court-ordered visitation of P.B. is controlled by the Supreme Court of Virginia's decision in Williams, which held:

> "For the constitutional requirement to be satisfied, before visitation can be ordered over the objection of the child's parents, a court must find an actual harm to the child's health or welfare without such visitation." A court reaches consideration of the "best interests" [of the child] standard in determining visitation only after it finds harm if visitation is not ordered.

Williams, 256 Va. at 22, 501 S.E.2d at 418 (quoting Williams v. Williams, 24 Va. App. 778, 784-85, 485 S.E.2d 651, 654 (1997)). Because the Supreme Court held in Williams that the actual harm standard must be satisfied *before* the statutory factors relating to a determination of the best interests of the child are addressed, appellate courts need to "tread lightly on this subject recognizing the magnitude of the parental interests at stake and the limited authority of the courts to upend those ancient, constitutionally protected, parental interests." Damon v. York, 54 Va. App. 544, 552, 680 S.E.2d 354, 358 (2009); see Griffin v. Griffin, 41 Va. App. 77, 84, 581 S.E.2d 899, 902 (2003) ("[T]he actual-harm test cannot be satisfied by a showing that it would be better, desirable, or beneficial for a child to have visitation with a non-parent." (internal quotation marks and citation omitted)).

In this case, the circuit court heard and considered appellants' evidence and mother's evidence during a two-day trial. At the conclusion of the evidence and following argument from the parties, the circuit court issued a thorough bench ruling, which spans approximately twenty pages of the joint appendix. Among its findings, the circuit court found no indications that P.B. had suffered actual harm and found no basis for concluding that he would suffer actual harm in the foreseeable future. Thus, applying Williams, the circuit court found that appellants failed to satisfy their burden.

To the extent that appellants contend in their first assignment of error on appeal that the circuit court's decision was contrary to the evidence that was admitted at trial,[4] "the judgment of the circuit court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680. Viewing the trial evidence in the light most favorable to mother (as we must since mother was the prevailing party below), we conclude that the circuit court's finding that the evidence failed to establish actual harm under Williams was supported by credible evidence. Id.

## B. DENIAL OF PRE-TRIAL RULE 4:10 MOTION

During oral argument before this Court, appellants' counsel clarified that appellants rely primarily on their second assignment of error on appeal, in which appellants allege that the circuit court committed reversible error when it denied their motion for a psychological examination of P.B. under Rule 4:10. Specifically, appellants' counsel contended during oral argument, "My point to the Court here is that when the [circuit] court denied our request under Rule 4:10 . . . for the examination by the psychologist, that [ruling] essentially became *outcome determinative* of this

---

[4] In support of their first assignment of error, appellants primarily rely upon a New Jersey Supreme Court opinion, Moriarty v. Bradt, 827 A.2d 203 (N.J. 2003). In Moriarty (as here), the lone surviving parent of the child forbade the grandparents from having any further contact with the child. However, the trial judge in Moriarty found in *the grandparents'* favor – and that conclusion in Moriarty was supported by extensive factual findings from the trial judge in that case. Here, the circuit court found in *mother's* favor. Thus, the record on appeal in this case does not establish the facts and circumstances that were so compelling to the trial judge in Moriarty.

case." (Emphasis added). In other words, appellants' counsel asserted that the circuit court's *pre-trial* decision to deny appellants' Rule 4:10 motion for a psychological examination of P.B. by their expert, Dr. Marvin, essentially thwarted appellants' attempt to satisfy the Williams actual harm standard *at trial*.

Rule 4:10 states, in pertinent part:

> When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending, upon motion of an adverse party, *may order* the party to submit to a physical or mental examination by one or more health care providers, as defined in § 8.01-581.1, employed by the moving party or to produce for examination the person in the party's custody or legal control. The order may be made only on motion *for good cause shown* and upon notice to the person to be examined and to all parties, shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made, and shall fix the time for filing the report and furnishing the copies.

Rule 4:10(a) (emphasis added).[5]

"Generally, the granting or denying of discovery is a matter within the discretion of the trial court and will not be reversed on appeal unless 'the action taken was improvident and affected substantial rights.'" O'Brian v. Langley Sch., 256 Va. 547, 552, 507 S.E.2d 363, 366 (1998) (quoting Rakes v. Fulcher, 210 Va. 542, 546, 172 S.E.2d 751, 755 (1970)); see Nizan v. Wells Fargo Bank Minn. N.A., 274 Va. 481, 500-01, 650 S.E.2d 497, 507 (2007). Furthermore, an

---

[5] Code § 20-124.2(D) also states, "In any case in which custody or visitation of minor children is at issue, whether in a circuit or district court, the court may order an independent mental health or psychological evaluation to assist the court in its determination of the best interests of the child." However, while appellants relied upon Code § 20-124.2(D) (as well as Rule 4:10) in the circuit court, any argument that the circuit court erred under Code § 20-124.2(D) is waived for purposes of appeal because appellants' assignments of error do not allege any error under that statute. See Fox v. Fox, 61 Va. App. 185, 202, 734 S.E.2d 662, 670 (2012) ("Rule 5A:20(c) requires us to hold that this issue is waived because it is not part of appellant's assignment of error."). Here, appellants' second assignment of error *only* alleges that the trial court "erred when it denied Appellants' request *for a Rule 4:10 examination* of the child." (Emphasis added). Accordingly, appellate review is confined to the trial court's discretionary decision under Rule 4:10.

examination order may only be granted "for good cause shown," according to Rule 4:10(a). See Wright v. Wright, 61 Va. App. 432, 466, 737 S.E.2d 519, 536 (2013) ("'A good cause determination invests a trial court with discretion.'" (quoting AME Fin. Corp. v. Kiritsis, 281 Va. 384, 392, 707 S.E.2d 820, 824 (2011))). Appellants had the burden as "the moving party to show a right to the relief sought." Goodhand v. Kildoo, 37 Va. App. 591, 599, 560 S.E.2d 463, 466 (2002).

Relying on the decision in Landrum v. Chippenham & Johnston-Willis Hosps., Inc., 282 Va. 346, 717 S.E.2d 134 (2011), appellants argue that the circuit court abused its discretion here because "an irrelevant or improper factor [was] considered and given significant weight" during the bench ruling denying appellants' Rule 4:10 motion. Id. at 352, 717 S.E.2d at 137 (citation omitted). Specifically, appellants challenge the circuit court's finding that any Rule 4:10 examination that involves contact with appellants is "an undertaking that's fraught with peril for the boy." During oral argument before this Court, appellants' counsel asserted that this finding was "pure speculation" and was unsupported by any evidence presented at the Rule 4:10 hearing. We disagree.

The Supreme Court of Virginia explained in Landrum that the phrase "abuse of discretion" means that the circuit court "*has a range of choice*, and that its decision will not be disturbed as long as it *stays within that range* and is not influenced by any mistake of law." Id. (internal quotation marks and citation omitted) (emphasis added). Similarly, this Court has explained that the "bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." Hamad v. Hamad, __ Va. App. __, __, 739 S.E.2d 232, __ (2013). Under settled Virginia case law, "'[o]nly when reasonable jurists could not differ can we say an abuse of discretion has occurred.'" Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009) (quoting Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743 (2005)).

At the pre-trial hearing in this case, the circuit court carefully considered appellants' request for the circuit court to order a Rule 4:10 examination of P.B. by Dr. Marvin.[6]  The circuit court acknowledged appellants' belief that a Rule 4:10 examination could potentially produce evidence relevant to a determination of actual harm to P.B.  However, the circuit court also explained that it needed to weigh P.B.'s best interests when it considered appellants' discovery request under Rule 4:10 – and that it needed to be convinced that the benefits of the examination "outweigh the burdens . . . that are implicit" in conducting a psychological examination of this young child.  The circuit court observed that "any kind of [R]ule 4:10 examination is by [its] very nature intrusive" on the person being examined.  The circuit court then observed that P.B. in particular – given his young age – would be subjected to a significant degree of "psychological poking and prodding" during the examination conducted by Dr. Marvin.  Appellants' counsel did not challenge either of these observations.  The circuit court also considered evidence, through the proffer of appellants' counsel, that there was "an incredible amount of contact" between P.B. and appellants when mother and P.B. lived at appellants' home.

As a general matter, when trial courts address matters concerning custody, visitation, and other child care issues, they are instructed to consider the best interests of the child.  See Farley v. Farley, 9 Va. App. 326, 327-28, 387 S.E.2d 794, 795 (1990).  Thus, the circuit court here expressly considered P.B.'s best interests when it addressed appellants' motion for a Rule 4:10 psychological examination of the young child.  Appellants' counsel did not object to this analysis.  The circuit court then concluded that subjecting P.B. to Dr. Marvin's examination procedure, re-initiating brief contact between P.B. and appellants for the limited purpose of the Rule 4:10 examination, and then

---

[6] At this hearing, the circuit court rejected an assertion by mother's counsel that appellants' contact with P.B. during the examination would be a *per se* violation of the Williams actual harm standard – given that mother objected to the examination request.  The circuit court found that appellants' contact with P.B. during the type of controlled examination described in the proffer by appellants' counsel would not constitute impermissible visitation between appellants and P.B.

potentially ordering no further contact between P.B. and appellants at a later hearing was simply not in P.B.'s best interests. This conclusion was not unsupported, as appellants claim on appeal – but was, instead, amply supported by the circumstances described above.

While another trial judge perhaps might have ordered appellants' requested Rule 4:10 examination after considering the same circumstances, that is not the test for an abuse of discretion. See Grattan, 278 Va. at 620, 685 S.E.2d at 644 ("*Only when reasonable jurists could not differ* can we say an abuse of discretion has occurred." (internal quotation marks and citation omitted) (emphasis added)). In its bench ruling explaining why it denied appellants' Rule 4:10 motion, the circuit court remained within the "range of choice" described by the Supreme Court in Landrum for matters that are within a circuit court's discretion. See Landrum, 282 Va. at 352, 717 S.E.2d at 137.

In addition, viewing the circumstances in this record in the light most favorable to mother (as we must since she is the prevailing party below), the circuit court did not err in finding that appellants failed to satisfy their burden of establishing "good cause" for their requested Rule 4:10 psychological examination of P.B. by Dr. Marvin. See Rule 4:10(a). While appellants assert that the Rule 4:10 examination was *necessary* for determining whether P.B. has suffered actual harm under Williams, we disagree with appellants' assertion. "It is not the purpose of [Rule 4:10] to create a final arbiter" of evidentiary disputes because that function must remain with the factfinder. Virginia Linen Service, Inc. v. Allen, 198 Va. 700, 703, 96 S.E.2d 86, 88 (1957).

Here, the circuit court expressly stated that appellants *could* potentially prove actual harm under the Williams standard through other means than a Rule 4:10 psychological examination of this young child. Dr. Marvin testified at trial as an expert witness in attachment theory, and he described several factors that would indicate that the severing of the relationship – between a child and a figure to whom that child is attached – has had a harmful effect on the child. Dr. Marvin also testified that, in his expert opinion, P.B. was indeed attached to appellants – particularly to

Mrs. Richter. The circuit court certainly considered Dr. Marvin's testimony. Furthermore, the circuit court permitted appellants to subpoena certain records from P.B.'s pediatrician and preschool – which were requested to aid the circuit court in determining whether P.B. exhibited any of the risk factors noted by Dr. Marvin that could result from the severing of a relationship with a person to whom a young child has an attachment. However, after considering all of the evidence admitted at trial, the circuit court found that the evidence failed to prove that P.B. had suffered (or foreseeably would suffer) actual harm -- which was appellants' burden of proof under the Supreme Court's decision in Williams.

The circuit court's ultimate finding that appellants failed to satisfy their evidentiary burden under Williams based on the evidence at trial simply does not lead to the conclusion that the circuit court committed a pre-trial abuse of discretion when it denied appellants' motion for a Rule 4:10 psychological examination of P.B. A party's mere assertion that a discovery tool "is necessary for a movant to investigate fully and prepare his case is clearly insufficient as a statement of good cause." Rakes, 210 Va. at 546, 172 S.E.2d at 755. Based on the circumstances in the record on appeal in this particular case, the circuit court here did not err in finding that appellants failed to establish good cause for the examination, as was required under the plain language of Rule 4:10(a). Accordingly, we hold that the circuit court did not abuse its discretion when it denied appellants' motion to order the Rule 4:10 examination of P.B.

### III. CONCLUSION

The Supreme Court's decision in Williams holds that petitioners for court-ordered visitation of a child over the objection of fit parents (or, in this case, a fit parent) must first establish that the child has suffered actual harm. Viewing the evidence in the light most favorable to mother (as we must since mother was the prevailing party below), the evidence at trial did not satisfy that initial burden in this case. Furthermore, the circuit court did not abuse its discretion prior to trial when it

found that ordering a Rule 4:10 psychological examination of P.B. was not in the young child's best interests and when it found that appellants' Rule 4:10 motion was not supported by good cause. Accordingly, for the foregoing reasons, we affirm the judgment of the circuit court.

<u>Affirmed.</u>