# Richmond

LESLIE ZIMMERMAN *v.* COMMONWEALTH.

January 14, 1937.

Present, All the Justices.

The opinion states the case.

*Lowry & Burks, W. W. Berry, Jr.,* and *Dillard, Dillard & Coleman,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Special Assistant,* for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

Leslie Zimmerman was convicted of second degree murder, and sentenced to confinement in the penitentiary for five years.

He assigns two errors. One is based on the allegation that he was not present during part of the trial, and the other is based on the refusal of the trial court to set aside the verdict and grant him a new trial on the ground of after-discovered evidence.

██ It appears that near the close of the trial the judge and the attorneys representing the Commonwealth and the accused retired to the judge's chambers for the purpose of considering instructions. When these had been duly considered, and as the judge was leaving his office, the Commonwealth's attorney addressed him thus: "I want, at this time, to renew my motion to introduce the witness Beth Dooley." Counsel for the accused objected and said that the court had ruled on that point. The judge replied that he was not going to change his ruling and immediately proceeded into the court room. When the above conversation occurred the accused was not in hearing distance.

The record shows that prior to this incident Beth Dooley had been called as a witness for the Commonwealth. During her cross-examination the relevancy of certain statements she had made, or was about to make before the jury, was raised by the accused. On his motion the testimony was excluded. The same question as to the admissibility of this evidence was raised at least three times prior to the time now under consideration, and after full argument in the presence of the accused, the court had, each time, excluded the testimony. When the Commonwealth's attorney again brought it up in chambers, the judge simply remarked: "I am not going to change my ruling on that." In other words, the court had previously, and at the request of the accused, ruled in his favor on the admissibility of this evidence. In his absence he stated he would adhere to his former ruling. A mere statement of the circumstances under which the remark of the judge was made, clearly shows that no official action, which might affect his rights, was taken in the absence of the accused.

On September 21, 1934, Pete Looney died from the effects of a wound about one and a half inches long on the right side of his forehead, just above the hair line. Warrants were issued for Bernice Dooley, George and Leslie Zimmerman, and Gertrude Gough, or Gertrude Reece, as she was sometimes called. Dooley and the two Zimmermans were arrested and held in jail for 10 days or more, and then released

without a preliminary hearing. For some time Gertrude Gough could not be found. She was finally located in Washington, D. C., serving a jail sentence for a misdemeanor committed in that city subsequent to the death of Pete Looney. She was released by the Washington authorities and brought back to Bedford county to face the charge of murder. After she was lodged in Bedford jail, she became the chief witness against George and Leslie Zimmerman, who were jointly indicted for the murder of Pete Looney. At the first trial of Leslie Zimmerman the jury were unable to agree. The record now before us contains the proceedings of the second trial. In order to show the relevancy of the affidavits introduced for and against the motion for a new trial based on after-discovered evidence, it is necessary to examine the evidence introduced at the trial in some detail.

Bernice Dooley and Pete Looney, beginning on September 16, 1934, and continuing until late in the afternoon of September 18th, were on a continuous drinking spree, in or near an old deserted house situated some 9 miles southwest of the town of Bedford, in a sparsely settled rural community known as Rocky Ford. About 3:00 P. M. on September 19th, Looney came to Bernice Dooley's home suffering from a scalp wound, which caused his death, and other scratches and bruises on his body. Dr. Bondurant was called in to see him that night. The doctor had him removed to the hospital in Lynchburg, where, as heretofore stated, he died on September 21st, of a fractured skull.

The Commonwealth, by various witnesses, proved Leslie Zimmerman had stated that Pete Looney, sometime prior to the killing, had stolen 20 gallons of moonshine whiskey from him, and that he was going to kill Looney for it. Leslie Zimmerman's wife told Beth Dooley, Bernice Dooley's wife, to keep Pete Looney away from her husband's home, or he (Pete Looney) would be shot. Harry and Clarence Dooley testified that Leslie Zimmerman told them that he had seen them pass one night, while he, Leslie, was lying

on the edge of the woods with a shot gun watching for Pete Looney.

The Commonwealth having established the threats and motives for the killing by other witnesses, introduced Gertrude Gough to prove the criminal act. She tesified that on Tuesday night, September 18th, she walked from her father's home, about a half a mile to Leslie Zimmerman's home, for the purpose of begging a ride to Bedford the next day, as she had to go to Washington. George and Leslie Zimmerman asked her to go to Bernice Dooley's home, about 2/3 of a mile farther, to get Looney, as they wanted to talk with him about the 20 gallons of whiskey they suspected him of stealing. When she arrived at the Dooley home, Looney was not there. Bernice Dooley and Beth Dooley, together with five Dooley children, started to the old deserted house, a mile or more farther west, where Bernice had left Pete Looney earlier in the afternoon. When these parties arrived at W. H. Raider's home, some 300 yards from the Dooley home, the five children were left with Raider for the night. Gertrude Gough, Bernice and Beth Dooley proceeded to the deserted house a mile or so farther, and there found Pete Looney. The four started back up the road. When they arrived at the Raider home, Bernice and Beth Dooley stopped a moment or two, Gertrude Gough and Pete Looney went down the road to Leslie Zimmerman's home, and there the Gough woman aroused Leslie Zimmerman from his bed, where he had retired with his wife, gave him a dollar for a half gallon of whiskey, and told him Pete Looney was outside. She and Looney started back to the deserted house. On the way they met Bernice and Beth Dooley, and stopped long enough for the men to take a drink out of each other's jars. This was about 10:00 or 10:30 P. M. Looney and the Gough woman proceeded to the deserted house. Bernice and Beth Dooley went to the Zimmerman house for some cigarettes or tobacco. Bernice Dooley testified that Zimmerman asked him if he met Gertrude and Looney, and when he replied in the affirmative, Zimmerman told him to go home and get off the road.

According to Gertrude Gough, she and Looney, a former sweetheart of hers, went to the deserted house, sat down at a spring until midnight, and then started to her father's home about a mile and a half away. She had gone a step or two when she heard some rustling in the bushes. She looked back, and by the moonlight, saw George Zimmerman facing Pete Looney, and Leslie approaching him from the bushes with a baseball bat in his hand. Leslie struck Looney on the head with the bat, knocking him down. Immediately after this one blow, which was all she saw, she turned and again started home. Before reaching her destination both Zimmermans overtook her, and in reply to her remark, "I suppose you killed him," Leslie said; "I only beat the hell out of him, but the son of a bitch won't steal any more of my whiskey."

The accused denied all the material evidence introduced by the Commonwealth, which tended to connect him with the crime. Several of his relatives tesified that he was in the town of Bedford at the time Gertrude Gough claims to have asked for a ride to Bedford. He admitted he sold her the whiskey that night, but denied he knew Looney was with her at the time. He admitted that Bernice and Beth Dooley came by his place for some tobacco, but denied telling them to go home and stay off the road. Other witnesses for the accused testified that Bernice Dooley was incensed at Pete Looney for having beaten him during their drunken spree, and that he made threats against Looney's life. Other, apparently disinterested witnesses testified that Bernice Dooley had a shot-gun with him the night in question, and that he made two or more attempts to borrow shells, but when he informed those to whom he had made the requests that he was going to shoot Looney, they refused to let him have the shells.

W. H. Raider, his wife and daughter, testified that Beth Dooley did not, as she and her husband claimed, spend that night at the Dooley home. On the contrary they stated that Beth came to the Raider home about 1:00 A. M., and asked permission to spend the night there with her

children; that this permission was granted, and about 6:00 A. M. the next morning she aroused the children, and took them with her to her husband's home.

It was proven that the deserted house in question has three rooms with a kitchen downstairs, and one room upstairs. The steps leading to the upper room are narrow and steep, resembling a ladder; that about three feet from the top floor there is a 2 by 6 cross-beam, running parallel to the steps to which the weather-boarding is nailed. On the bottom floor, near the steps, were found blood stains; there were also stains on the 2 by 6 beam that resembled blood. On the upstairs floor were some broken pieces of terra cotta, which had apparently been recently broken. There was no evidence of a struggle in the yard at or near the spot where Gertrude Gough said she saw Pete Looney knocked down. What became of Pete Looney, or what he did from midnight September 18th until about 3:30 P. M. on September 19th, when he appeared with his fatal wound, and the half gallon jar of whiskey, at the Dooley home, no one seems to know.

On this evidence, in conflict in every material point, the jury found, as it had a right to find, Leslie Zimmerman guilty of murder in the second degree. The only eye-witness who stated the accused delivered the fatal blow or blows, is Gertrude Gough.

After verdict and before the judgment became final, the accused moved to set the verdict aside on the ground of after-discovered evidence, and in support of the motion, filed several affidavits. The new material is set forth in the affidavits of Lucy King and Matthew Overstreet. According to Lucy King, late in September or early in October, Gertrude stopped by her home in Franklin county; that she was nervous and asked for a drink which was refused; that during the course of the conversation Gertrude Gough said that she had just come from Bedford county where she had been drinking with a man in an upstairs room of an old deserted house; that in a quarrel with him she hit him on the nose and knocked him down the steps, and that she left him

lying on the floor and bleeding without attempting to ascertain the extent of his injuries.

Matthew Overstreet, a resident of Bedford county, stated that between 12:00 and 1:00 o'clock on September 19, 1934, he had a conversation with Gertrude Gough at the Norfolk & Western Railway station in Roanoke in which she said that she was going away, but did not know where, as she had gotten into trouble in Bedford county. She refused to tell him the nature of the trouble, but said that he would see an account of it in the papers. As he left her she asked him not to tell anyone that he had seen her in Roanoke.

The Commonwealth concedes that the evidence of these two witnesses was communicated to the accused, or his attorneys, after the verdict was rendered, and that the accused exercised due diligence in preparation for his trial, and failed to discover the existence of this evidence prior to the trial. However, the Commonwealth contends that the evidence was not material and was only admissible for the purpose of impeaching the testimony of Gertrude Gough, and that inasmuch as her veracity was impeached by numerous witnesses, including several members of the police force of the City of Lynchburg, it was merely cumulative and corroborative of the impeachment. With this contention we cannot agree.

In *Hines* v. *Commonwealth*, 136 Va. 728, 744, 117 S. E. 843, 848, 35 A. L. R. 431, the question of extra-judicial confessions or admissions of a third party, that he committed the crime, was reviewed at length. The almost unanimous holding, by the courts of other jurisdictions to the effect that such confessions of third parties, made out of court, are not admissible because the admission violates the rule regarding hearsay, was rejected by this court, and the exception to the hearsay rule was extended to criminal as well as civil cases. The reason for this extension is so clearly stated by Judge Kelly in that opinion that it need not be repeated. In the course of the opinion this is said: "If it be suggested that a third party making a confession out of court could not be compelled to testify because it would tend

to incriminate him, the answer seems easy enough. If he were dead or out of the jurisdiction, the question of privilege would not arise; if he were alive and present and claimed his privilege, he would not be available as a witness, and the exception would apply with as much reason as if he were dead or absent. And so, too (as seems to have probably happened in *Blocker* v. *State* [55 Tex. Cr. R. 30, 114 S. W. 814, 131 Am. St. Rep. 772], infra), if he were present and testifying, but denying that he made any such confession, then his own original testimony would not be available and it would be competent and proper to introduce proof of the alleged confession by others who heard it, and let the jury determine as to the credibility of the testimony."

Gertrude Gough's original confessions, according to the affidavits in question, were not available to the accused, notwithstanding the fact that she was present and testified in the trial. She was not cross-examined on these alleged statements to Lucy King and Matthew Overstreet, for the reason that the accused was unaware of the fact that these witnesses would testify that she had made the statements. The force and effect of her whole testimony is virtually a denial that she had ever made any such confessions to the witnesses in question. Under the ruling in the *Hines Case* the alleged confessions were material evidence for the accused, and if offered would have doubtless gone to the jury for it to determine the weight, if any, that should be given them.

The accused not being able to discover this evidence in time, now submits it to the court for the purpose of obtaining a new trial in order that another jury may have the benefit of such evidence in determining his guilt or innocence. If this evidence was all, under the ruling in the *Hines Case*, the motion should be sustained. But in this case numerous counter-affidavits by the Commonwealth were filed denying the truth of every material statement alleged by the accused to have been discovered after the verdict. We have held in numerous cases that under such circumstances it is the duty of the trial judge to receive such counter-affidavits or other legal evidence offered, and from all the

evidence introduced for and against the motion, to determine whether or not the new evidence, if offered, would probably result in a different verdict. *Wilson's Ex'r* v. *Keckley*, 107 Va. 592, 59 S. E. 383; *Pauley* v. *Commonwealth*, 151 Va. 510, 144 S. E. 361; *Fenner* v. *Commonwealth*, 152 Va. 1014, 148 S. E. 821; *Akers* v. *Commonwealth*, 155 Va. 1046, 156 S. E. 763; *Holmes* v. *Commonwealth*, 156 Va. 963, 157 S. E. 554.

This rule necessarily imposes upon the judge the duty of weighing conflicting evidence. It is difficult, if not impossible to formulate any hard and fast rule applicable to all cases. Where, as in this case, the existence or the truth of the new evidence is denied, neither the trial court nor this court should weigh the same with the exactness or closeness incumbent on the jury to weigh evidence in passing upon the guilt or innocence of the accused. Still some weight must be given to counter-affidavits to determine the probable effect of the alleged after-discovered evidence. In passing upon such conflict, it is well to bear in mind how easy it sometimes is for the losing party to obtain affidavits from his sympathetic friends to be used in support of a motion for a new trial. Some courts have held that when affidavits, or other proofs, are introduced for and against such motions, which are conflicting and contradictory, so that it requires a precise estimate to determine as to the greater weight or preponderance, the trial court's conclusions will not be disturbed unless they result in manifest injustice. 20 R. C. L. 308. This statement is of very little help because we cannot be certain that an injustice will not result from the attempt of the court to pass on a substantial conflict in evidence. Truth, at times, is just as elusive to the court as to the jury.

Without attempting to enlarge upon the principles stated in the Virginia cases heretofore cited, but applying them to the record in this case, we find no reversible error. The after-discovered evidence produced is of very doubtful value when scrutinized in the light of the counter-affidavits. The Commonwealth's attorney states, in his affidavit, that Lucy King was introduced as a witness for the defendant in the

subsequent trial of George Zimmerman; that on cross-examination she stated she had seen Gertrude Gough only once before the time of the alleged confession, and that in the fall of 1930 or 1931. The circumstances of that meeting, as related by Lucy King on the stand, were about 2:00 P. M. on a Sunday, in one of the years stated, Gertrude Gough was riding in a car with Esmond Zimmerman (the father of George and Leslie) and another man and woman, along the Ferrum road near Rocky Mount, when they met, on the wet road, another car in which Nellie Young, the niece of Lucy King, was riding, and that the two cars had some difficulty in passing each other. As a result of the near collision Nellie Young and Gertrude got in a fight on the side of the road. The next time she saw Gertrude Gough was in the fall of 1934, some 3 or 4 years later, when Gertrude Gough was again riding in a car, with a man who was unknown to Lucy King, along the road near Rocky Mount. She stopped, went into the home of Lucy King, and during a half hour's visit made the alleged confession.

There is no reason suggested for Gertrude Gough travelling many miles from her father's home in Bedford county to Lucy King's home in Franklin county, and spending 30 minutes in the home of a stranger, and telling that stranger that she was a fugitive from justice from Bedford county. No one else testified that Gertrude Gough was seen in Franklin county on this occasion. It is true that the sheriff testified that while he was attempting to locate Gertrude Gough in order to arrest her for the murder of Pete Looney, he heard she was in Franklin county, and he went over there to make the arrest, but could find no trace of her. This is not a corroboration of Lucy King's statement that Gertrude Gough was in that county.

The alleged confession or admission of Gertrude Gough to Lucy King, under the circumstances narrated, is not in accord with the usual experience of mankind, and in the absence of corroboration the trial judge was right in refusing to disturb the verdict on this ground.

The affidavits filed by both parties clearly established the

fact that Gertrude Gough arrived in Washington on September 19, 1934, some time prior to 7:00 P. M. The affidavit of the agent for the Norfolk & Western Railway Co., in Bedford, stated that at 11:04 A. M., September 19, 1934, Gertrude Gough bought a ticket for, and boarded a train leaving Bedford en route to Lynchburg. Other affidavits were to the effect that Gertrude Gough went to Washington that day by way of Lynchburg. At the time Overstreet claims to have had the conversation with the witness in Roanoke, Pete Looney was alive, and at that time no one seems to have known the extent of his injuries.

There was some evidence tending to prove that Leslie Zimmerman made several attempts to get witnesses to change their testimony. In addition the same learned trial judge who tried this case also presided at the subsequent trial of George Zimmerman. In that case he observed the demeanor of both Gertrude Gough, Lucy King and Matthew Overstreet, when they gave testimony substantially in accord with that herein stated. He observed the demeanor and heard the witnesses who were introduced to impeach the testimony of both Lucy King and Gertrude Gough, and with that information before him, he refused to grant this accused a new trial.

In view of all the circumstances stated we do not think the after-discovered evidence is of sufficient probative value for this court to reverse the ruling of the trial court in its refusal to set aside the verdict.

For the reasons stated we find no reversible error in the record now before us, and the judgment of the trial court is affirmed.

*Affirmed.*