PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and
Lemons, JJ., and Compton,* S.J.

JANICE LARUE ORNDORFF

v.  Record No. 051478    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                        April 21, 2006
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

In this appeal, we decide whether a circuit court erred in
refusing to grant a defendant's motion for a new trial based on
after-discovered evidence of a mental disorder that allegedly
would support an insanity defense.

Janice Larue Orndorff (Orndorff) was indicted by a grand
jury in Prince William County for crimes involving the death of
her husband, Goering G. Orndorff (Goering).  In a jury trial in
the circuit court, Orndorff was convicted of second-degree
murder, in violation of Code § 18.2-32, and use of a firearm in
the commission of murder, in violation of Code § 18.2-53.1.

After the jury found Orndorff guilty of these offenses, but
before the sentencing phase of the trial, Orndorff moved for a
new trial based on after-discovered evidence.  She contended
that this new evidence would show that at the time of the murder
she suffered from dissociative identity disorder (DID),[1] which

_____

* Senior Justice Compton participated in the hearing and
decision of this case before his death on April 9, 2006.
[1] The Diagnostic and Statistical Manual of Mental Disorders
states that the four diagnostic criteria of DID are:

she alleged would support an insanity defense.  At Orndorff's

request, the circuit court agreed to delay ruling on the motion

for a new trial until after the completion of the sentencing

phase.  The jury fixed Orndorff's sentence at 32 years'

imprisonment for the murder and three years' imprisonment for

the firearms offense.  The circuit court denied Orndorff's

motion for a new trial and imposed sentence in accordance with

the jury verdict.

A divided panel of the Court of Appeals reversed the

circuit court's judgment and vacated the two convictions,

holding that the circuit court abused its discretion in denying

the motion for a new trial, and remanded the case to the circuit

court.  Orndorff v. Commonwealth, 44 Va. App. 368, 605 S.E.2d

307 (2004).  After the Court of Appeals granted the

Commonwealth's petition for a rehearing en banc, a majority of

---

(A) [t]he presence of two or more distinct identities
or personality states (each with its own relatively
enduring pattern of perceiving, relating to, and
thinking about the environment and self)[;] (B) [a]t
least two of these identities or personality states
recurrently take control of the person's behavior[;]
(C) [i]nability to recall important personal
information that is too extensive to be explained by
ordinary forgetfulness[; and] (D) [t]he disturbance is
not due to the direct physiological effects of a
substance, (e.g., blackouts or chaotic behavior during
[a]lcohol [i]ntoxication) or a general medical
condition, (e.g., complex partial seizures).

The American Psychiatric Association, Diagnostic and
Statistical Manual of Mental Disorders § 300.14, at 487
(4th ed. 1994).

2

the Court of Appeals approved the circuit court's denial of the motion for a new trial and affirmed the circuit court's judgment. <u>Orndorff v. Commonwealth</u>, 45 Va. App. 822, 613 S.E.2d 876 (2005).

## I.

The evidence at trial showed that Orndorff and Goering were married in 1993. By early 2000, they were experiencing serious problems in their marriage. Orndorff contacted her mother-in-law frequently and expressed concerns about Goering's fidelity. Goering's mother testified that Orndorff said that she would see "[her husband] dead before he [left her] for another woman." However, Goering's mother stated that she was not alarmed by the threat and noted that Orndorff also "consistently [stated] that she loved Goering" and that "he's [her] whole life and that's what [she] live[s] for."

Also during this period, Orndorff contacted Thomas G. Underwood, a friend and attorney who previously had represented both Orndorff and Goering. Orndorff expressed concern about Goering's drinking and possible infidelity, as well as the safety of her two sons from a previous marriage who still lived at home. Orndorff asked Underwood to represent her in a potential divorce proceeding, but he declined based on his past representation of Goering. Underwood instead agreed to refer

her to another lawyer.  Orndorff also asked Underwood to prepare a will for her that left all her property to her children.

During the afternoon of March 20, 2000, Underwood informed Orndorff that the lawyer he had recommended was unavailable to meet with her for about a week.  Orndorff, sounding unconcerned about the delay, mentioned to Underwood that she and Goering planned to have dinner that evening on the occasion of their anniversary.

Earlier that day, Orndorff's mother-in-law contacted Goering inquiring about the state of his marriage.  She testified that her son stated, "[T]hings are worse, I've had all I can take, I'm leaving tonight."

That night, the Orndorffs went to dinner as planned.  When they returned home, Judd L. Bond, Orndorff's son, observed Goering yelling and "stomping around."  Bond left the house shortly thereafter.

At 8:37 p.m., Orndorff telephoned Underwood and reported that she had shot her husband, stating that he had approached her holding a knife and a baseball bat.  She stated that Goering was still alive and asked Underwood to come to the house.  After learning that Orndorff had not summoned an ambulance, Underwood told her to contact a "911" operator immediately.  Because Orndorff sounded "hysterical," Underwood also telephoned "911" shortly after he finished speaking with her.

4

At 8:39 p.m., Orndorff spoke with a "911" operator and stated that she had shot her husband after he approached her holding a baseball bat and a knife. She also told the operator that she was afraid to "come out of hiding" in the house because her husband was alive, had gained possession of the gun, and was trying to kill her.

During the approximately hour-long conversation with the "911" operator, Orndorff's tone alternated between lucid and hysterically disoriented. At times, she spoke calmly and called the operator by name. At other times, however, she seemed unable to discern with whom she was speaking. Occasionally, she asked to speak to her "mommy," and at one point appeared to be addressing her mother directly. Several times during the telephone conversation, Orndorff cried hysterically without responding to the operator's questions and repeatedly asked for help, stating, "He is going to kill me."

A transcript of the "911" telephone conversation revealed that several of Orndorff's statements were confusing and contradictory. Orndorff said at one point that she did not know whether she was sitting down. Asked where in the house she was hiding, Orndorff indicated that it was dark and stated that she was unaware of her location. Although Orndorff initially stated that her husband was on the kitchen floor, she later said that she did not know where he was. Additionally, she admitted

5

knowing Underwood but stated that she had not contacted him that night.

About 9:30 p.m., one of the police officers responding to the Orndorff residence opened the front door.  Orndorff approached the door with a cordless telephone in her hand.  When the officer signaled for her to come out of the house, she turned around and retreated inside.  A few minutes later, Orndorff ran out of the house screaming that her husband was trying to kill her.

Officer Robert J. McHale testified that Orndorff appeared to be "hysterical."  Detecting the smell of alcohol, McHale asked her if she had been drinking.  She calmly replied that she had consumed a "couple of glasses of wine with dinner," and then resumed her former hysterical demeanor.

The police found Goering's body in the kitchen lying facedown with a baseball bat in the left hand and a knife pinned underneath the body in the right hand.  He had been shot five times: once in the left palm, three times in his torso, and once in the top of his head.  On a table in the kitchen, the police found a handgun next to a telephone book, which had been opened to a page that included Underwood's telephone number.

The evidence further showed that in July 2000, Orndorff approached Maura J. Workman, with whom both Orndorff and Goering were acquainted.  According to Workman, Orndorff said that she

6

was facing imprisonment and offered to pay Workman $10,000 if she would testify that Goering had physically abused Orndorff. Workman testified that she had never seen Goering act in an abusive manner toward his wife and did not accept Orndorff's offer.

## II.

Orndorff was indicted for the first-degree murder of her husband and for use of a firearm during the commission of murder. Before trial, Orndorff gave notice that she intended to present psychiatric and psychological evidence that she suffered from amnesia after the shooting. She sought to present this evidence to rebut the anticipated argument that her behavior on the night of the murder was calculated to deceive the police. She conceded that her evidence did not support an insanity defense.

At a pretrial hearing on the Commonwealth's motion to exclude this evidence, Orndorff presented testimony from Dr. Susan J. Fiester, a forensic psychiatrist, and Dr. Wilfred G. van Gorp, a clinical psychologist, who both had been retained to assess Orndorff's mental state. After being qualified by the court to present expert testimony, these witnesses testified that Orndorff suffered from various mental disorders, including post-traumatic stress disorder and "dissociative disorder not otherwise specified." Dr. Fiester described that dissociative

7

disorder as the diagnosis indicated when a patient's symptoms meet many of the criteria of a specific dissociative disorder but do not "fit it exactly." Dr. Fiester and Dr. van Gorp based their diagnoses on personal interviews with Orndorff, Orndorff's inability to remember the events surrounding her husband's death, her behavior during the "911" telephone conversation, transcripts of her interviews with the police, and a review of her prior history.

Dr. Fiester and Dr. van Gorp both testified that Orndorff had a propensity to dissociate, meaning that she periodically divorced her emotions and actions from her conscious awareness, and had experienced a dissociative state caused by the trauma of her husband's death. Neither witness opined that Orndorff suffered from DID or any other mental disorder that allegedly would support an insanity defense. Dr. Fiester stated that she found "no evidence that [Orndorff] was legally insane at the time of the offense" nor any evidence that she killed her husband because of an irresistible impulse. After hearing this evidence, the circuit court ruled that the mental health experts would be permitted to testify about the nature of dissociative amnesia but would not be allowed to testify that they had actually examined or diagnosed Orndorff.

At trial, the Commonwealth argued that Orndorff's post-shooting demeanor was a ruse designed to conceal her guilt. The

8

Commonwealth presented witnesses who qualified as experts in the fields of autopsy and bloodstain analysis. These witnesses testified that the forensic evidence indicated Orndorff had arranged the weapons in Goering's hands after the shooting. However, Orndorff presented a forensic medical expert, who challenged this assertion and testified that the relative locations of Goering's body and the weapons were physiologically possible. Defense counsel argued that Orndorff shot her husband in self-defense, and that her behavior afterward could be attributed to a dissociative episode caused by the trauma she had just experienced. Consistent with her pretrial representation, Orndorff did not argue that she was legally insane at the time of the offense. The jury found Orndorff guilty of second-degree murder and use of a firearm in the commission of murder.

Shortly after her conviction, before the sentencing phase of the trial was to begin, Orndorff exhibited unusual behavior. She told jail personnel that she was 12 years old and did not belong in the "strict school" because she had done nothing wrong. As a result of this behavior, Orndorff underwent additional mental evaluations.

According to Dr. Fiester, Orndorff was unaware of both her age and location. "Her understanding of the situation," Dr. Fiester testified, "was that she's in dire fear because she's a

9

child and she's done something wrong and she has no idea what it is and why she's where she is."  Dr. Fiester noted that Orndorff's symptoms, in addition to fitting the profile of a dissociative episode, also suggested that she had a psychiatric illness.  Dr. Fiester explained:

> It could raise the question of whether she might have problems with her reality testing; whether there is a psychotic part of the picture; whether there is what's called a dissociative identity disorder, which is what used to be known in the past as a multiple personality disorder; or some other type of dissociative disorder.

Concluding, Dr. Fiester opined that Orndorff suffered from a "severe mental illness" that rendered her incompetent to assist counsel in her defense.

Dr. van Gorp stated his opinion regarding this new behavior in a letter to defense counsel:

> It is my firm opinion that this decline and abrupt change in [Orndorff's] mental state represents a state of regression and dissociation, producing a fugue-like state in which she has regressed to the identity she had as a child.  At the very least, this represents dramatic regression in a person who has seriously dissociated: that is, in lay terms, she has become overwhelmed by the stress of her circumstances, and cannot consciously process what has happened to her.  As a response, she has "split off" from her conscious experience, and regressed to a child-like state, now believing she is in school in Union City, Tennessee, where she apparently grew up.  This altered identity also raises the possibility of an even more serious condition, in which dissociation is more pervasive, and a multiple personality disorder must be seriously considered and psychologically and psychiatrically ruled out.

10

Based on these evaluations, the circuit court determined that Orndorff was not competent to participate in the sentencing phase of her trial. The court entered an order committing her to Central State Hospital (Central State) for evaluation and treatment pursuant to Code § 19.2-169.1. Orndorff remained at Central State for eight months under the care of Dr. Greg J. Wolber, a psychologist who headed Central State's forensic evaluation team, and Dr. Daniel Sheneman, the attending psychiatrist for the behavioral unit in which Orndorff was placed. Dr. Sheneman diagnosed Orndorff as having post-traumatic stress disorder.

Dr. Wolber conferred with Dr. Paul F. Dell, a clinical psychologist and an authority on dissociative disorders. Dr. Dell diagnosed Orndorff as having DID. After consulting with Dr. Dell, Dr. Fiester and Dr. van Gorp revised their diagnoses and concurred that Orndorff suffered from DID. Dr. Wolber and Dr. Sheneman, however, disagreed with this new diagnosis and concluded that Orndorff did not suffer from DID. After considering these various opinions, the circuit court certified that Orndorff was competent to participate in the sentencing phase of her trial.

Immediately before the sentencing phase began, Orndorff filed a motion for a new trial based on after-discovered evidence. However, defense counsel requested that the circuit

court defer its ruling on the motion so that evidence of the new diagnosis of DID could be presented as mitigation evidence during the sentencing phase of the trial.  Defense counsel represented that Orndorff would offer that same evidence in support of her new trial motion.  The circuit court agreed to this procedure and postponed ruling on the motion for a new trial until the sentencing phase was completed.

During the sentencing phase, Dr. Dell testified that after he observed in Orndorff manifestations of three separate "alter" personalities, he concluded that she suffered from DID.  In addition to the host personality of Janice Orndorff, Dr. Dell identified: (1) "Jacob," a strong, forceful male "protector" personality; (2) "Jean Bugineau," a French-speaking personality; and (3) "Janice Nanney," a 12-year-old child.  Dr. Dell noted that DID is difficult to diagnose because the "alter" personalities do not appear to be visibly different from the host personality and, being "cautious," do not announce their presence.  He testified that Orndorff's "911" telephone conversation contained evidence of her "switching" between personalities.

Dr. van Gorp described the interplay between Orndorff's different personalities, stating that the "alter" personalities are "walled off usually from the conscious experience of the host personality" and each "has his or her own basic memories."

According to Dr. van Gorp, DID is an uncommon condition, and it can be difficult to diagnose because the "switching" of personalities that indicates the presence of the illness only occurs during periods of stress. Dr. van Gorp noted that, in retrospect, Orndorff's comments during the "911" conversation were consistent with those likely made by one suffering from DID. However, he stated that the only indicators at that time of a possible DID condition were the references to "mommy," which, standing alone, were insufficient to establish a diagnosis of DID.

Dr. Fiester testified that she was only able to reach a diagnosis of DID after witnessing Orndorff present "as a twelve-year-old girl" following her conviction and on learning of the repeated reemergence of that same "alter" personality. According to Dr. Fiester, the manifestation of an "alter" personality is necessary for a diagnosis of DID. In response to testimony that Orndorff told others that she could "make herself be twelve years old," Dr. Fiester stated that persons suffering from DID are often frightened by its effects and want to believe that they have control over the process even though they do not.

Dr. Richard J. Loewenstein, a psychiatrist and authority on trauma disorders and dissociative disorders, also diagnosed Orndorff as having DID after witnessing her childlike and protector "alter" personalities. Noting that most individuals

13

suffering from DID report a history of significant childhood trauma, Dr. Loewenstein testified that Orndorff told him that her mother had whipped Orndorff with a switch and locked her alone in a room for long periods when she was a child. Orndorff, however, had not previously reported this history to her other doctors.

Dr. Loewenstein remarked that other episodes from Orndorff's past also were consistent with symptoms of DID. He cited the fact that over a period of several years, Orndorff had been observed in a trance-like state, had been forgetful on a chronic basis, and had experienced behavioral "swings."

According to Dr. Loewenstein, the Janice, or "host," personality had no memory of shooting her husband, but a "protector alter" appeared to have a clear recollection. Dr. Loewenstein was able to observe one of the "protector alters," who stated that it and the "Jean alter" had done the shooting. Dr. Loewenstein opined that "at the time of the murder, [Orndorff] was overwhelmed by symptoms of [DID]" and therefore "her mental state at the time of the crime should lead to a finding of legal insanity by Virginia law under the 'irresistible impulse' test of the insanity statutes." All medical expert witnesses presented by the defense testified that they did not believe that Orndorff was malingering.

14

Dr. Sheneman testified that he only observed the manifestation of the 12-year-old persona in Orndorff and stated that he was not convinced that this presentation qualified as a distinct identity.  As a result, he explained that he did not think that Orndorff met the criteria for DID.  Dr. Sheneman also testified that the childhood abuse Orndorff described was not of the severe type normally found in people suffering from DID.

The Commonwealth also presented the testimony of Angela M. Valentine, who was Orndorff's cellmate before Orndorff was committed to Central State and upon Orndorff's return to the jail.  Valentine testified that Orndorff said that "she could act like she was twelve years old when she got good and ready . . . so she could, you know, beat the doctors at Central State."

During the competency hearing and the sentencing phase of the trial, Orndorff disrupted the proceedings with verbal outbursts, challenging statements made by the prosecutors. After hearing all the evidence, the jury returned its sentencing verdict, and the circuit court denied Orndorff's motion for a new trial.  The court stated that Orndorff had failed to show that she could not have obtained the evidence of her DID condition for use at trial through the exercise of reasonable diligence, and that she failed to demonstrate that this

15

additional evidence should produce an opposite result in another trial. The court noted:

> In part, I conclude that [such evidence] would not produce opposite results on the merits at another trial because the jury did, in fact, hear all this. They heard[,] in essence, her entire position, that she had DID, that there were multiple personalities, in fact, . . . another personality is the one that committed the murder . . . .

The circuit court sentenced Orndorff in accordance with the jury verdict. Orndorff appealed from the circuit court's judgment.

## III.

The Court of Appeals' panel that reversed and vacated Orndorff's convictions concluded that she met the "reasonable diligence" requirement for a new trial set forth in Odum v. Commonwealth, 225 Va. 123, 130, 301 S.E.2d 145, 149 (1983). Orndorff, 44 Va. App. at 400, 605 S.E.2d at 323. Addressing the Odum "materiality" requirement, the panel held that "the [circuit] court abused its discretion in relying on the jury's apparent rejection of Orndorff's mitigating evidence at sentencing as grounds for concluding that such evidence would not produce a different result at the guilt phase." Id. at 401-02, 605 S.E.2d at 324. The panel stated that it is "no surprise [that already] having found Orndorff to be a murderer and a liar, the jury apparently found her belated mitigating evidence of insanity unpersuasive." Id. at 402, 605 S.E.2d at 324. The

16

panel then assumed the truth and accuracy of Orndorff's after-discovered evidence and held that such evidence "present[s] a viable defense of legal insanity under the doctrine of irresistible impulse" and would produce opposite results on the merits at another trial. Id. at 404, 605 S.E.2d at 325.

In reaching a different result on rehearing en banc, the Court of Appeals first concluded that the circuit court did not err in holding that Orndorff was competent to stand trial in the sentencing phase. Orndorff, 45 Va. App. at 845-46, 613 S.E.2d at 887-88. Second, the Court observed that Orndorff had exhibited symptoms of DID prior to trial, including the "911" telephone conversation in which she asked for her "mommy" while speaking to an operator. Thus, the Court held that the post-trial "diagnosis of DID was really just a different diagnosis of a known condition" that could have been made before trial in the exercise of reasonable diligence. Id. at 841-42, 613 S.E.2d at 885-86.

Finally, the Court of Appeals concluded that the circuit court did not abuse its discretion in relying on the jury's apparent rejection of the after-discovered evidence at sentencing as the basis for concluding that Orndorff failed to show that the new evidence should produce opposite results at another trial. Id. at 844, 613 S.E.2d at 887. The Court observed that the jury heard conflicting expert testimony

17

concerning whether Orndorff met the diagnostic criteria for DID, as well as testimony from Valentine, Orndorff's cellmate, that Orndorff bragged about being able to manipulate her behavior at will. Id. at 843, 613 S.E.2d at 886. Concluding that "the jury discounted the new diagnosis of DID and sentenced [Orndorff] to far in excess of the minimum sentence for the offense," the Court of Appeals held that "[a] new trial presenting the same evidence to a new jury would not produce a different result." Id. at 843-44, 613 S.E.2d at 886-87. We awarded Orndorff an appeal.

                              IV.

We first consider whether the circuit court erred in holding that Orndorff was competent to stand trial in the sentencing phase after being treated at Central State. Orndorff argues that the evidence showed that she was not competent at this point in the trial, and that the dissociative episodes she experienced during the sentencing phase further support this conclusion. We disagree with Orndorff's arguments.

Under Code § 19.2-169.1(E), the party alleging that a criminal defendant is incompetent to participate in her defense bears the burden of proof on this issue by a preponderance of the evidence. The determination whether a defendant is competent is based on whether the defendant lacks substantial capacity to understand the criminal proceedings against her or

18

is incapable of assisting counsel in her defense.  Id.; Burns v. Commonwealth, 261 Va. 307, 336, 541 S.E.2d 872, 891 (2001).  The United States Supreme Court has explained in greater detail that the standard for competency to stand trial "is whether the defendant has 'sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against [her].' "  Godinez v. Moran, 509 U.S. 389, 396 (1993) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)).

The determination whether a criminal defendant is competent to stand trial is a question of fact that will not be disturbed on appeal unless plainly wrong.  See United States v. Robinson, 404 F.3d 850, 856 (4th Cir. 2005); United States v. Verduzco-Martinez, 186 F.3d 1208, 1211 (10th Cir. 1999); see also Bailey v. Commonwealth, 259 Va. 723, 746, 529 S.E.2d 570, 583-84 (2000).  In conducting our review, we consider the evidence in the light most favorable to the Commonwealth, the prevailing party on this issue in the circuit court.  Dixon v. Commonwealth, 270 Va. 34, 37, 613 S.E.2d 398, 399 (2005); Tucker v. Commonwealth, 268 Va. 490, 492, 604 S.E.2d 66, 67 (2004).

We hold that the circuit court's competency determination is supported by the evidence and is not plainly wrong.  The court received evidence from Dr. Wolber and Dr. Sheneman, who

each concluded that Orndorff did not suffer from DID but had several less serious conditions, including post-traumatic stress disorder, which did not render her unable to understand the proceedings or to assist counsel in her defense. These witnesses reached their conclusions during extensive contact with Orndorff over the eight-month period that she remained at Central State. After assessing the progress of Orndorff's treatment at Central State, they determined that they had been successful in "desensitizing" her to certain topics, such as crime scene photographs and accounts of the shooting, which would be most likely to cause her to dissociate in the courtroom.

Dr. Wolber and Dr. Sheneman also stated that Orndorff could exercise some volitional control over the timing and duration of her dissociative episodes. Dr. Sheneman further explained that he had identified methods that could be used to stop these episodes should they occur during trial. Based on all these observations and assessments, Dr. Wolber and Dr. Sheneman both concluded that Orndorff was competent to participate in the sentencing phase of her trial.

Although there was conflicting testimony regarding the issue of Orndorff's competency, the circuit court chose to rely on the testimony of Dr. Wolber and Dr. Sheneman. Based on this

evidentiary support for the circuit court's finding, we will not disturb that finding on appeal.

V.

We next consider Orndorff's argument that the Court of Appeals erred in approving the circuit court's denial of her motion for a new trial based on after-discovered evidence. Such a motion is a matter submitted to the sound discretion of the circuit court and will be granted only under unusual circumstances after particular care and caution has been given to the evidence presented. Commonwealth v. Tweed, 264 Va. 524, 528, 570 S.E.2d 797, 800 (2002); Stockton v. Commonwealth, 227 Va. 124, 149, 314 S.E.2d 371, 387 (1984); Fulcher v. Whitlow, 208 Va. 34, 37, 155 S.E.2d 362, 365 (1967).

A moving party's burden of proof before the circuit court on a motion for a new trial based on after-discovered evidence is well established. The moving party must establish that such evidence

> (1) appears to have been discovered subsequent to the trial; (2) could not have been secured for use at the trial in the exercise of reasonable diligence by the movant; (3) is not merely cumulative, corroborative or collateral; and (4) is material, and such as should produce opposite results on the merits at another trial.

Odum, 225 Va. at 130, 301 S.E.2d at 149.

In the circuit court and on appeal, the Commonwealth has not disputed that Orndorff has met the first and third

21

requirements set forth above.  The Commonwealth instead has asserted that Orndorff has failed to prove the second and fourth requirements of the Odum test, namely, those of "reasonable diligence" and "materiality."  Because both the circuit court and the Court of Appeals confined their review of Orndorff's new trial motion to these two requirements, we likewise limit our consideration to the same requirements.

## A. Reasonable Diligence

Orndorff argues that the circuit court's failure to award her a new trial denied her the constitutional right to present a defense.  She asserts that she exercised reasonable diligence before trial in securing the opinions of qualified medical expert witnesses to determine whether she had a mental condition that might support an insanity defense.  Orndorff contends that the circuit court and the Court of Appeals did not adequately consider the fact that these expert witnesses were unable to render a diagnosis of DID until the appearance of her "alter" personalities after the guilt phase of the trial.  Orndorff further maintains that the DID diagnosis was only one part of the after-discovered evidence, which also showed that at the time of the shooting one of her "alter" personalities committed the offense.

In response, the Commonwealth argues that Orndorff failed to exercise reasonable diligence in considering the implications

22

of the evidence already known to her before trial.  The

Commonwealth contends that because this evidence, including the

"911" conversation in which she asked for her "mommy," showed

that Orndorff had experienced dissociative episodes, her expert

witnesses could have reached a diagnosis of DID before the trial

began.  We disagree with the Commonwealth's arguments.

We previously have discussed the scope of the reasonable

diligence requirement as it pertains to a motion for a new trial

based on after-discovered evidence.  In Mason v. Commonwealth,

154 Va. 890, 894-95, 153 S.E. 684, 685 (1930), we stated that

> [w]hat is reasonable diligence depends upon the facts
> and circumstances of each particular case; the burden
> is on the mover to show to the court that he has
> exercised due or reasonable diligence to ascertain
> relevant facts before trial, and that such diligence
> did not reveal the existence of, nor show the
> probability of the existence of, the evidence now
> relied upon.

We conclude that the same definition of reasonable

diligence applies to a moving party's duty to ascertain relevant

expert opinions based on the facts of a case.  Thus, in the

present case, it was insufficient for Orndorff merely to prove

that she could not have discovered the evidence of her DID by

the exercise of reasonable diligence.  She also was required to

show that she actually attempted to secure such evidence in a

diligent and timely manner but was prevented from obtaining the

evidence for a particular reason.  See Lewis v. Commonwealth,

23

209 Va. 602, 609, 166 S.E.2d 248, 253 (1969); Fulcher, 208 Va. at 38, 155 S.E.2d at 365.

We hold that the Court of Appeals erred in concluding that Orndorff failed to exercise such reasonable diligence in obtaining psychiatric and psychological evidence for her defense. Orndorff consulted Dr. Fiester, a forensic psychiatrist and authority on personality disorders, and Dr. van Gorp, a clinical psychologist, neuropsychologist, and an authority on malingering. Both experts were asked to determine whether Orndorff had any psychiatric or psychological disorders that might be relevant to her defense.

These medical experts performed a thorough analysis based on the available facts, including the "911" telephone conversation and their personal interviews and testing of Orndorff, and submitted their findings to Orndorff's counsel. Dr. Fiester and Dr. van Gorp specifically concluded that although Orndorff had experienced dissociative episodes, she did not suffer from DID or any other mental disorder that could potentially support an insanity defense.

According to these witnesses, Orndorff's disorder was not fully revealed until after she manifested the personality of a 12-year-old child following the jury verdict in the guilt phase of the trial. When asked to explain why he had not identified this condition earlier, Dr. van Gorp testified that a diagnosis

24

of DID "can only be made when [a patient's] various alters, or separate personalities, emerge."  Dr. Fiester likewise stated that DID can only be diagnosed when there is "the presence of a separate identity."

The Court of Appeals, however, held that Orndorff did not meet the reasonable diligence component of the Odum test because her experts could have discovered earlier the several symptoms of DID that they later identified.  We disagree with this holding because it improperly shifted the focus of the reasonable diligence inquiry by effectively assigning to Orndorff's counsel the responsibility for reaching a different medical diagnosis.

The reasonable diligence inquiry addresses the sufficiency of counsel's actions, not the actions of medical professionals retained by counsel.  Thus, although counsel may be required under the facts of a given case to obtain additional or different expert opinions to satisfy counsel's duty of due diligence, defense counsel's efforts here were sufficient.  The particular areas of specialty held by Dr. Fiester and Dr. van Gorp directly involved the medical issues presented in this case, and they both conducted a thorough and well-reasoned analysis of those issues in their evaluations of Orndorff's condition.

While Dr. Dell and Dr. Lowenstein testified at the sentencing phase that Orndorff exhibited clear symptoms of DID before trial, their suggestion that the DID illness could have been diagnosed earlier did not shift that duty of evaluating the various symptoms from Orndorff's medical experts to her counsel. Therefore, we conclude that when presented with Dr. Fiester's and Dr. van Gorp's opinions that Orndorff did not have a mental disorder that might support an insanity defense, Orndorff's counsel reasonably relied on those opinions and were not required to seek the opinions of other experts. Accordingly, we hold that the Court of Appeals erred in concluding that Orndorff failed to meet the "reasonable diligence" requirement for a new trial based on after-discovered evidence.

## B. Materiality

We next consider the Court of Appeals' holding that Orndorff failed to satisfy the "materiality" requirement of the Odum test. Orndorff contends that the circuit court abused its discretion in denying her motion for a new trial by relying on the failure of the jury to mitigate her punishment after hearing evidence of her mental illness in the sentencing phase of the trial. Orndorff maintains that the correct standard for determining whether to grant a new trial is whether a new, unbiased jury would have accepted her evidence of an insanity defense.

The Commonwealth replies that the circuit court and the Court of Appeals properly relied on the jury's apparent rejection of the DID evidence at the sentencing phase in determining whether another jury would reach a different result on the merits at a new trial. The Commonwealth also notes that it presented substantial testimony at the sentencing phase to counter Orndorff's evidence, and that this evidence further supports the circuit court's denial of the new trial motion. We disagree with the Commonwealth's arguments.

As stated above, under the "materiality" requirement of the Odum test, Orndorff was required to prove that the evidence in question was "material, and such as should produce opposite results on the merits at another trial." 225 Va. at 130, 301 S.E.2d at 149. This established standard has also been expressed as requiring that the evidence be such that it "ought to produce opposite results on the merits" at another trial. Lewis v. Commonwealth, 209 Va. at 608-09, 166 S.E.2d at 253 (quoting Reiber v. James M. Duncan, Jr. & Assocs., Inc., 206 Va. 657, 663, 145 S.E.2d 157, 162 (1965)).

When, as here, the evidence supporting the new trial motion is contradicted by evidence in opposition to the motion, the circuit court is not permitted to presume that the moving party's evidence is true but is required to weigh all the evidence presented in determining whether the moving party has

27

satisfied the materiality standard articulated in Odum.  See Fulcher, 208 Va. at 38, 155 S.E.2d at 365; Independent Cab Ass'n v. LaTouche, 197 Va. 367, 377-78, 89 S.E.2d 320, 327 (1955); Henry v. Commonwealth, 195 Va. 281, 294, 77 S.E.2d 863, 871 (1953); Zimmerman v. Commonwealth, 167 Va. 578, 586-87, 189 S.E. 144, 148 (1937); Holmes v. Commonwealth, 156 Va. 963, 969, 157 S.E. 554, 556 (1931).  Thus, when a circuit court is presented with conflicting evidence in considering a motion for a new trial, the court's role resembles that of a fact finder in determining whether the evidence is such that it should produce an opposite result on the merits at a new trial.  See Zimmerman, 167 Va. at 587, 189 S.E. at 148; Holmes, 156 Va. at 969, 157 S.E. at 556.

In the present case, the circuit court did not weigh the conflicting evidence at issue but instead relied on the jury's apparent rejection of the mitigation evidence presented during the sentencing phase.  We conclude that the circuit court's reliance on the jury's sentencing decision was error because the court substituted in place of its own judgment the reaction of a jury that had already resolved crucial credibility issues against Orndorff in the guilt phase of trial.  Under the Odum test, the circuit court was required to make its own determination whether a new jury that had not previously considered the evidence in the case should reach a different

28

result on the merits at a new trial.  225 Va. at 130, 301 S.E.2d at 149.

We further conclude that the Court of Appeals erred in approving the circuit court's judgment on the same basis as that articulated by the circuit court.  Because the circuit court employed an improper legal standard in exercising its discretionary function, the standard of appellate review examining whether the court abused its discretion could not be applied.  See Thomas v. Commonwealth, 263 Va. 216, 233, 559 S.E.2d 652, 661 (2002).  Instead, the proper remedy for the circuit court's error was to remand the case to that court for proper application of the Odum materiality test based on the conflicting evidence already offered regarding the new trial motion.  Thus, we now direct that this case be remanded to the circuit court so that the court may take this action to determine whether Orndorff, the moving party on the new trial motion, has met her burden of satisfying the Odum materiality requirement.[2]

We decline the Commonwealth's request that we also decide the question of law whether a defendant who suffers from DID and commits an act allegedly performed by one of the defendant's

---

[2] In light of our holding, we need not address Orndorff's additional contention that the Court of Appeals construed her introduction of mitigating evidence at the sentencing phase as an implied waiver of her right to present that evidence to a new jury in a new trial.

"alter" personalities may assert an insanity defense at a criminal trial on those charges. Because the circuit court did not rule on this issue, we will not resolve it here, nor will we speculate whether the circuit court will be required to reach that issue in conducting its "materiality" analysis on remand.

We emphasize, however, that the appellate courts of this Commonwealth have not yet decided this issue. In addition, we note that our review of the decisions of other jurisdictions reveals an absence of any consensus regarding the recognition of a DID-based insanity defense. See, e.g., United States v. Denny-Shaffer, 2 F.3d 999, 1016 (10th Cir. 1993) (insanity defense should have been submitted to jury based on evidence that defendant's "host" personality was not in control of "alter" personality and was not aware of "alter" personality's control of defendant's physical actions); Kirkland v. State, 304 S.E.2d 561, 564 (Ga. Ct. App. 1983) (criminal responsibility of defendant must be assessed according to defendant's state of mind under personality acting at time crime committed); State v. Halcomb, 510 N.W.2d 344, 351 (Neb. Ct. App. 1993) (defendant criminally responsible for actions because irrespective whether "alter" personality acted in commission of crimes, defendant alone committed those acts and there was no evidence that he met criteria for insanity defense); State v. Grimsley, 444 N.E.2d 1071, 1075-76 (Ohio Ct. App. 1982) (criminal responsibility of

30

defendant is determined based on whether defendant was aware of actions of "alter" personality controlling her behavior so as to render those actions product of her own volition); State v. Greene, 984 P.2d 1024, 1029 (Wash. 1999) (declining to adopt specific legal standard for assessing sanity of criminal defendant suffering from DID due to inadequacy of legal authority on subject and insufficiency of record before court); State v. Lockhart, 542 S.E.2d 443, 455 (W. Va. 2000) (refusing to adopt any specific test for admission of expert testimony in DID cases and holding that such testimony must be evaluated on case-by-case basis).

## VI.

In conclusion, we hold that the Court of Appeals did not err in approving the circuit court's determination that Orndorff was competent to stand trial in the sentencing phase of the proceedings. We further hold, however, that the Court of Appeals erred in approving the part of the circuit court's judgment holding that Orndorff failed to meet her burden of proving the "reasonable diligence" component of the Odum test. We also hold that the Court of Appeals erred in approving the part of the circuit court's judgment that misapplied the "materiality" component of the Odum test. For these reasons, we will affirm in part, and reverse in part, the Court of Appeals' judgment. We will remand the case to the Court of Appeals for

31

further remand to the circuit court for application of the "materiality" component of the <u>Odum</u> test and any other proceedings as may be necessary in accordance with the principles expressed in this opinion.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and remanded.</u>

32